INVESTMENT REGISTRY, Limited, v. CHICAGO & M. E. R. CO. et al.

REYNOLDS et al. v. MOSES.

(Circuit Court of Appeals, Seventh Circuit. June 6, 1913.)

No. 1993.

1. APPEAL AND ERROR (§ 82*)—DECISIONS REVIEWABLE—FINALITY OF INTERLOCUTORY DECREE—DENYING CONFIRMATION OF SALE.

The successful bidder for property sold under a decree of foreclosure, whether or not previously a party to the suit, becomes a new party in his capacity as purchaser, and as to him a decree or order denying confirmation of the sale is final and appealable.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 379–385, 414, 416, 478, 479, 482, 483, 517–522; Dec. Dig. § 82.*

Finality of judgments and decrees for purposes of review, see notes to Brush Electric Co. v. Electric Improvement Co. of San Jose, 2 C. C. A. 379; Central Trust Co. v. Madden, 17 C. C. A. 238; Prescott & A. C. Ry. Co. v. Atchison, T. & S. F. R. Co., 28 C. C. A. 482.]

2. APPEAL AND ERROR (§ 154*)—PERSONS ENTITLED TO APPEAL—ESTOPPEL.

A reorganization committee of bondholders, whose purchase of the property of a corporation at foreclosure sale was set aside on the ground that they were parties to a combination to suppress competition at the sale, did not estop themselves from exercising the right to appeal from the decree denying confirmation by offering to increase the amount of their bid.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 957–969; Dec. Dig. § 154.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. MORTGAGES (§ 526*) — FORECLOSURE SALE — PERSONS WHO MAY QUESTION VALIDITY.

A court may on the motion of the master or an outsider even, or on its own motion, investigate charges of actual or constructive fraud in a foreclosure sale made under its order, and the position or previous conduct of the party objecting to confirmation is immaterial.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 1530–1534; Dec. Dig. § 526.*]

4. RAILROADS (§ 192*)—FORECLOSURE SALE—VALIDITY—COMBINATION IN RESTRAINT OF BIDDING.

Pending a suit to foreclose a mortgage securing bonds of an electric railroad company, third persons, having no previous interest, bought up a large number of the bonds with the intention of buying the property at the foreclosure sale and using the bonds in payment. Prior to the sale, however, they sold their bonds to a syndicate of bondholders for a sum largely in excess of the cost to them and more than $300,000 greater than the actual or market value of the bonds, with an agreement that they and their agents would "to the extent of their power and influence * * * in every reasonable way aid and assist the purchasers in becoming the purchasers" of the property. The syndicate transferred the bonds to a reorganization committee, which assumed its obligations under the contract, including liability for a deferred payment of the greater part of the purchase price. Such committee was the only bidder at the foreclosure sale and purchased the property of the company for less than its fair value. *Held*, on the evidence, that it was one of the purposes of the syndicate in buying the outside bonds to prevent the holders from competing at the sale, that the reorganization committee was chargeable with notice of the purpose and effect of such contract, and that the court properly refused to confirm the sale on objections by a nonassenting bondholder.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 391, 634–642; Dec. Dig. § 192.*]

5. RAILROADS (§ 192*)—FORECLOSURE SALE—VALIDITY—COMBINATION IN RESTRAINT OF BIDDING.

Such contract was not rendered lawful by the fact that at the time it was made the sellers of the bonds by their purchases had acquired an interest under the mortgage where their sole purpose was to use the bonds in buying the property at the sale.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 391, 634–642; Dec. Dig. § 192.*]

6. RAILROADS (§ 192*)—FORECLOSURE SALES—VALIDITY.

In cases of foreclosure sales of the property of railroad companies or other large corporations, where by reason of the large sums involved general bidders are excluded and it has become customary for bondholders to combine and buy in the property for the purpose of reorganization, where there are nonassenting bondholders it is the duty of the court to be vigilant to see, on the one hand, that a dissenter is not permitted to create a maneuvering value in his bonds by opposing confirmation, and, on the other, that the majority does not use its power to oppress the minority.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 391, 634–642; Dec. Dig. § 192.*]

7. RAILROADS (§ 192*)—FORECLOSURE SALES—VACATION AND RESALE.

Where a sale of the property of a railroad company under a foreclosure decree was set aside and increased bids were offered by others, it was discretionary with the court to receive competitive bids in open court or to order a resale.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 391, 634–642; Dec. Dig. § 192.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Suit in equity by the Investment Registry, Limited, against the Chicago & Milwaukee Electric Railroad Company and others. George M. Reynolds, Ernest A. Hamill, W. E. Stavert, George A. Somerville, Miller Lash, and others appeal from an order sustaining objections of Matilda W. Moses, and vacating a sale of the property of defendant railroad company. Affirmed.

For opinion below, see 206 Fed. 488.

This is an appeal by the Reorganization Committee, which was the sole bidder and became the purchaser at the foreclosure sale of the property of the Chicago & Milwaukee Electric Railroad Company of Illinois, from a decree refusing to confirm the sale and ordering a resale.

Two corporations of the same name had been organized, one under the laws of Illinois, the other, of Wisconsin; their roads constituted a continuous line from Chicago to Milwaukee; and, under a lease of the Wisconsin road, the Illinois corporation operated the entire line.

A finding of facts was made by the trial court, as follows:

"The court doth find that said objector, Matilda W. Moses, is now and has since November, 1905, been the owner and holder of 12 bonds of the Chicago & Milwaukee Electric Railroad Company (Illinois corporation), dated July 1, 1902, and maturing July 1, 1922, being part of the issue of $4,000,000 of an authorized issue of $5,000,000 of bonds of said company secured by a deed of trust to said Merchants' Loan & Trust Company, trustee, and described in the decree herein, together with interest coupons attached to said bonds and maturing on and after July, 1908; that said bonds of said objector had never been filed by her with any bondholders' protective committee or any reorganization committee of the properties of either of said railroads, but are still in the possession of said objector.

"The court further finds that, after default in the payment of interest due July 1, 1908, upon the bonds of the Chicago & Milwaukee Railroad Company (Wisconsin corporation) on the issue of $10,000,000, certain of the bondholders, owning certain of said bonds, entered into a so-called Bondholders' Protective Agreement, bearing date the 10th day of October, 1908, with John V. Clark and C. B. Shedd, of Chicago, Miller Lash, George A. Somerville, and Robert Cassels of Toronto, Canada, wherein and whereby said persons last named were constituted a committee in the interest of the bondholders of said Wisconsin corporation who might deposit their bonds with certain depositories therein designated, under and pursuant to the terms of said agreement; that subsequent to the organization of said committee, certain of the bondholders of said Wisconsin corporation, deposited with the depositories therein named the bonds owned by them respectively; that the personnel of said committee continued the same until the death of John V. Clark in May, 1911, whereupon, pursuant to the terms of the agreement providing for the filling of vacancies in the membership of said committee resulting from the death of any of the members thereof, Ernest A. Hamill, of Chicago, was made a member of said committee in his place; and that continuously since said time said committee was and is now composed of said Hamill, said Lash, said Shedd, said Somerville, and said Cassels; that, from and after the creation of said committee, said committee was and continued to be represented by Jacob Newman and the firm of Newman, Northrup, Levinson & Becker, of Chicago, and Miller Lash, of Toronto, as their attorneys and counsel.

"The court further finds: That some time in the year 1908, and after the appointment of the receiver herein, a syndicate was organized, named and known as the Chicago & Milwaukee Assisting Syndicate (hereinafter for brevity called the 'Assisting Syndicate'); said syndicate being composed of various banks, bankers, and institutions in the Dominion of Canada, which banks, bankers, and institutions had, in the course of business and before the

appointment of the receiver herein, acquired, held, and owned, in the years 1909 and 1910, and previously thereto, a large number of bonds of the Chicago & Milwaukee Electric Railroad Company (the Wisconsin corporation), forming a part of said $10,000,000 issue of bonds, and aggregating between $3,000,000 and $4,000,000 face value, and also a small quantity of the bonds of the Chicago & Milwaukee Electric Railroad Company (the Illinois corporation), forming a part of said $5,000,000 issue of bonds. That some time in the year 1908 a syndicate was likewise organized, named and known as the Chicago & Milwaukee Underwriting Syndicate (hereinafter for brevity called the 'Underwriting Syndicate'); said Underwriting Syndicate being likewise composed of various banks, bankers, and financial institutions in the Dominion of Canada, some of which were the same as composed said Assisting Syndicate, said Underwriting Syndicate having been organized for the purpose of formulating and putting into operation a plan of reorganization of the properties of said Illinois corporation. That some time in the year 1909 said Underwriting Syndicate procured the control, by contract with certain holders residing in Holland and known as the Dutch bondholders, of bonds of said Illinois corporation aggregating 1647 in number of said 1922 issue of bonds, for the purposes of said plan of reorganization of said Underwriting Syndicate, but without such Underwriting Syndicate thereby acquiring any proprietary interest therein or ownership thereof. That said Assisting Syndicate and said Underwriting Syndicate, from and after the time of their organization respectively, were represented by and acted through H. S. Osler, as the counsel of each of said syndicates, said Osler being the same Osler who became a member of the Reorganization Committee hereinafter mentioned.

"The court further finds: That prior to the year 1908 there was organized under the laws of the state of Wisconsin and existing a corporation known as the Milwaukee Electric Railway & Light Company; also, a corporation known as the Milwaukee Light, Heat & Traction Company. That the said Milwaukee Electric Railway & Light Company was then, and thereafter continued to be the owner and operator of lines of electric railroad in, and in the vicinity of, Milwaukee. That the Milwaukee Light, Heat & Traction Company then and thereafter owned and operated, and continued to own and operate interurban lines of electric railroad between the city of Milwaukee and various points outside of said city, including an electric line from the city of Milwaukee to the city of Kenosha, in the state of Wisconsin. That the stocks of said two corporations last named were, at said time, and thereafter continued to be at the times hereinafter mentioned, largely owned and controlled by a holding company known as the North American Company of New Jersey. That John I. Beggs and Charles F. Pfister were at said time, and thereafter continued to be, the sole resident directors in Wisconsin of said North American Company, and that said Beggs, Pfister, Fred Vogel, Jr., and George P. Miller, the attorney of said traction company, were the only resident directors in the state of Wisconsin of said traction company. That at and for some time prior to January 1, 1910, the parties in interest and control of the said North American Company, said traction company, and said railway and light company had planned an extension of said interurban line between Milwaukee and Kenosha so as to ultimately have a continuous line of electric railroad from Milwaukee to the city of Chicago to be used in competition with the interurban lines of the Chicago & Milwaukee Electric Railroad Company (Wisconsin and Illinois corporations). That after the appointment of receivers herein and about January, 1909, the said persons interested in and controlling said line from Milwaukee to Kenosha, acting for and on behalf of said traction company, conceived the plan and scheme of acquiring for said traction company a controlling interest in the Chicago & Milwaukee Electric Railroad Company (the Illinois corporation), through the purchase of a majority or more of the outstanding bonds of said railroad, and of a majority or more of the outstanding bonds of an underlying issue of bonds of $1,080,000 (said underlying issue being a prior lien upon all the properties of said railroad other than said West Line of said railroad and the line from Lake Bluff

to Rockefeller, to said $5,000,000 issue of bonds), with a view and for the purpose and object of ultimately bidding in and acquiring by purchase at said foreclosure sale, to be held in this proceeding, the properties, rights and franchises of said Chicago & Milwaukee Electric Railroad Company (the Illinois corporation) and of using said bonds for said purpose, and of connecting up the lines of railroad of the latter corporation with the lines of railroad of said traction company running between Kenosha and Milwaukee, so as to give the latter company a continuous right of way and line between Milwaukee and Chicago. That pursuant to said plan and scheme, and with the object aforesaid, the said traction company, through its officers and agents, secretly and without disclosing their identity or their object and purpose, proceeded to and did buy from various holders thereof in the open market bonds of said Chicago & Milwaukee Electric Railroad Company (Illinois corporation), being a part of said Illinois issue of bonds, and had, in the latter part of 1910, acquired by purchase, and then owned, bonds of said issue aggregating at par approximately $300,000, and bonds of said underlying issue aggregating approximately $520,000 par value, and that said purchases were made by said traction company with its own funds.

"The court further finds that in the month of December, 1910, certain of the officials in control of said North American Company and said traction company found fault with the said purchases of said bonds, and thereupon said Beggs and Pfister offered to and did purchase and acquire of and from said traction company, all the said bonds then held by it, at the price paid therefor, by said company, with interest; that thereafter, between the month of December, 1910, and April 21, 1911, said Beggs and Pfister continued to, and did, from time to·time, during said period, acquire other of said bonds, so that, on April 21, 1911, said Pfister and Beggs owned 401 of said bonds known as 1922 bonds and 530 of said underlying bonds known as the 1919 bonds, said purchase of said Pfister and Beggs having been made by them pursuant to and under the same plan and scheme, and with the same object and purpose in view, as had been the purchases by said traction company, and having likewise been made secretly and without disclosing their identity or their said object and purpose; that, at the time of the appointment of receivers herein, neither said traction company, said railway and light company, said North American Company, nor said Pfister and Beggs, owned, held, or were interested in any of the bonds of said Chicago & Milwaukee Electric Railroad Company (Illinois corporation); and that said purchases of said bonds were made for the purpose of enabling said traction company and said Pfister and Beggs to use said bonds in bidding for the properties, rights, and franchises of said Illinois corporation at said foreclosure sale herein, and not for the purpose of the investment of their funds therein.

"The court further finds that in the latter part of 1910 it came to the knowledge of said committee of said Wisconsin bondholders and to the knowledge of said Assisting Syndicate and their respective counsel that said traction company and said Pfister and Beggs had acquired said bonds pursuant to said scheme and plan and with the purpose and object aforesaid, and that thereafter in the month of April, 1911, the said Assisting Syndicate, by and with the knowledge, consent, and approval of said Wisconsin Committee, opened negotiations with said Beggs and Pfister for the purpose of securing said 401 1922 bonds and said 530 1919 bonds from said Pfister and Beggs by purchase and of thereby preventing and defeating consummation and execution of their said plan and scheme and of thereby frustrating their proposed action having in view the bidding in and acquisition of the properties, rights, and franchises of said Chicago & Milwaukee Electric Railroad Company (Illinois corporation) at the foreclosure sale to be held herein, in competition with other persons proposing to bid at said sale, and of thereby persuading and inducing said Pfister and Beggs to refrain and desist from their said intention to acquire the said properties, rights, and franchises and to refrain and desist from bidding upon said properties, franchises, and rights at said foreclosure sale.

"And that said negotiations in the month of April, 1911, resulted in the sale by said Pfister and Beggs and the acquisition by said Assisting Syndi-

cate, acting in the interests of its members and of said Wisconsin Committee, by agreement dated April 21, 1911, of said bonds then owned by said Pfister and Beggs, aggregating $931,000 par value of said Illinois corporation, at a price of $1,122,636.25, of which said amount said Pfister and Beggs received the sum of $300,000 in cash; that according to the terms of said agreement the balance of said purchase price, namely, $822,636.25, was not to·be paid to said Pfister and Beggs by said Assisting Syndicate until 30 days after the sale herein; that said agreement was not consummated until May 1, 1911, at which time the same was finally approved and consummated by the members of said Assisting Syndicate and by said Pfister and Beggs; that, before said approval thereof by the members of said Assisting Syndicate, said Wisconsin Committee and the members thereof entered into an agreement with said As-sisting Syndicate wherein and whereby said Wisconsin Committee obligated itself to hold said Assisting Syndicate harmless from all liability on account of said purchase price of .said bonds to said Pfister and Beggs in excess of the sum of $260,650 [being the purchase price of said 401 1922 bonds at $650 per bond], and pledging as security for said indemnity all of the Wisconsin bonds theretofore deposited with said committee under the terms and provi-sions of said deposit agreement.

"That as part and parcel of said agreement of purchase it was provided that the said Pfister and Beggs, and their attorneys and associates, should, to the extent of their power, influence and in every reasonable way aid and assist the said purchasers in becoming the purchasers of the Chicago & Mil-waukee Electric Railroad property (both Illinois and Wisconsin divisions) and in making effective their plan of reorganization thereof; that the plan of reorganization referred to was a plan of reorganization substantially the same as the plan of reorganization formulated by the Reorganization Com-mittee under the agreement of January 26, 1912.

"The court further finds that the amount so agreed to be paid by said As-sisting Syndicate to said Pfister and Beggs for said 931 bonds of said Illinois corporation was more than $300,000 in excess of the amount paid therefor by said traction company and said Pfister and Beggs and was approximately 120 per cent. of the par value of said bonds; that at the time said agreement of April 21, 1911, was executed, said 1922 bonds did not have a market value in excess of $650 per bond; that said excessive purchase price was agreed to be paid by said Assisting Syndicate, and said covenant on the part of said Pfister and Beggs, for themselves, their associates and attorneys, taken for the purpose of requiring said Pfister and Beggs, their associates and attor-neys, to desist and refrain, and said Pfister and Beggs, their associates and attorneys, did by reason thereof desist and refrain, from bidding or offering to purchase or acquire the properties, rights, and franchises of said Chicago & Milwaukee Electric Railroad Company (said Illinois corporation) at said foreclosure sale held under the decree herein, as they would otherwise have done but for the purchasing of said bonds aforesaid and the understanding and agreement aforesaid.

"And the court further finds that by reason of the action of said Assisting Syndicate in purchasing said bonds, and by reason of said understanding and agreement with said Pfister and Beggs as aforesaid, bidding at said sale for said properties, rights, and franchises of said Illinois corporation was and was intended by the parties thereto to be chilled, suppressed, stifled, and re-strained.

"The court further finds that in the month of January, 1911, and after said plan and scheme of said traction company and said Pfister and Beggs had come to the knowledge of said Assisting Syndicate and said Wisconsin Bond-holders' Committee, it came to the knowledge of said Assisting Syndicate and said Underwriting Syndicate that George P. Miller, the attorney of said trac-tion company and said Pfister and Beggs, was in negotiation with said Dutch bondholders owning said 1647 bonds of said Illinois corporation, for the pur-pose of acquiring the same by purchase for and on behalf of said Pfister and Beggs, and that thereupon and in the month of January, 1911, said Assisting Syndicate, fearing that said negotiations conducted in behalf of said Pfister

and Beggs would result in the acquisition by them of said 1647 bonds, again opened negotiations in their own behalf for the purchase of said bonds from said Dutch bondholders; that as a result of said negotiations said Assisting Syndicate, on March 10, 1911, entered into a tentative contract of purchase for said bonds with said Dutch bondholders, by the terms of which said 1647 bonds were agreed to be sold by said Dutch bondholders to said Assisting Syndicate, said Assisting Syndicate agreeing to pay therefor by the bonds of a new company to be organized pursuant to said plans of reorganization of said Underwriting Syndicate, or, in the event that the properties of said railroad were not acquired at foreclosure sale by said Assisting Syndicate or said Underwriting Syndicate, upon the basis of the payment of $600 net per bond in cash for each of said 1647 bonds; that said tentative agreement of March 10, 1911, was within a few days thereafter confirmed, and said agreement became operative, and that within ten days after such confirmation of such tentative agreement said negotiations between said Assisting Syndicate and said Pfister and Beggs were begun.

"The court further finds that thereafter and on the 26th day of January, 1912, a certain plan and agreement for the reorganization of said Chicago & Milwaukee Electric Railroad Company (Illinois corporation) and Chicago & Milwaukee Electric Railroad Company (Wisconsin corporation) was entered into as of that date between George M. Reynolds and said Ernest A. Hamill, said George A. Somerville, said Miller Lash, and said Robert Cassels, all of whom, save said Reynolds, then constituting said Wisconsin Committee under said agreement of October 10, 1908, W. E. Stavert, R. Floyd Clinch, H. S. Osler, Edward A. Shedd, and John R. Thompson, all on the one part, Chicago Title & Trust Company of Chicago and the National Trust Company, Ltd., of Toronto, Canada, on the other part, and the holders of bonds issued by said Illinois and said Wisconsin corporations depositing their bonds under said agreement of January 26, 1912, on the last part, wherein and whereby said Reynolds and others were constituted a Reorganization Committee of said roads; that said Reorganization Committee had, as part of said agreement, formulated a plan contemplating the purchase of the properties of both the Illinois and Wisconsin corporations by said Reorganization Committee in the interests of bondholders depositing their bonds thereunder in the organization of a new corporation or corporations under the laws of Wisconsin or Illinois, or both, which should acquire the properties of said Illinois and Wisconsin corporations from said Reorganization Committee when acquired at said foreclosure sale; that said plan further contemplated the issuance of a new bond issue of $10,000,000, $4,500,000 of which was to be immediately issued, a second bond issue of $4,500,000, a third bond issue of $6,000,000, and a capital stock issue of $6,000,000, making a total of $26,500,000 par value of bonds and stock proposed to be issued, of which $21,000,000 par value of bonds and stocks were to be presently issued upon the security of the present property, rights, and franchises of said Illinois and Wisconsin corporations, and none others, and at a cost to said Reorganization Committee of not to exceed $6,500,000, said cost including all expenses to be incurred by said Reorganization Committee in adjusting and discharging liens, and rehabilitating the properties of said Illinois and Wisconsin corporations in Illinois and Wisconsin, including all extensions and betterments thereof, and including a connection with the elevated roads in Chicago.

"That immediately upon the organization of said committee, Jacob Newman, the firm of Newman, Levinson, Becker & Cleveland, John P. Wilson of Chicago, and Miller Lash and H. S. Osler of Toronto, Canada, became and continued to act as the attorneys and counselors of said Reorganization Committee; that pursuant to said plan and agreement of January 26, 1912, said Reorganization Committee, through said Harry E. Smith and Norman J. Ford, became and were the only bidders of said properties, rights, and franchises of said Illinois corporation at said foreclosure sale herein, and also became and were the only bidders of the properties, rights and franchises of said Wisconsin corporation at the foreclosure sale held at Racine, Wis., on September 25, 1912; that the deposits made by said Smith and Ford, as prospective bidders,

with the special master in chancery appointed herein to conduct said sale and said sale at Racine, were in truth and in fact the funds of said Reorganization Committee; and that the real bidders at said sales were said Reorganization Committee appointed under said agreement of January 26, 1912.

"The court further finds that on the 26th day of January, 1912, said Reorganization Committee, by resolution of that date, by unanimous vote at a meeting held on said date, as a condition to the deposit by said Assisting Syndicate under said plan of reorganization of bonds aggregating $3,671,000 of said Illinois corporation then owned or controlled by said Assisting Syndicate, accepted a proposition of said Assisting Syndicate submitted to said Reorganization Committee on said date by said H. S. Osler and W. E. Stavert to assume and pay, and did on said day undertake to assume and pay the liability of said Assisting Syndicate to pay said Pfister and Beggs the balance due on their said contract of April 21, 1911, viz., the sum of $822,635.25, with interest thereon at 5 per cent. from April 7, 1911, as provided in said contract, and the obligation of said Wisconsin Committee to said Assisting Syndicate incurred by said agreement between said parties dated May 1, 1911.

"That at the time said action by said Reorganization Committee was taken, said committee was chargeable in fact with full knowledge of the existence of said agreement and understanding hereinbefore found between said Pfister and Beggs and their associates and attorneys on the one part, and said Assisting Syndicate and said Wisconsin Committee on the other part, to prevent, chill, suppress, stifle, and restrain competition at said foreclosure sale of said Illinois properties, and that said action of said Reorganization Committee in assuming and agreeing to pay said obligation amounted to aiding and abetting said Assisting Syndicate and said Wisconsin Committee in carrying out said scheme and plan and was taken to enable said Reorganization Committee, pursuant to its said plan and scheme of reorganization, to acquire said properties, rights, and franchises at a price inadequate and disproportionate to the real value of said properties, to be arbitrarily fixed and determined by said Reorganization Committee without competition from said Pfister and Beggs and their associates.

"The court further finds that the properties, rights, and franchises of the Chicago & Milwaukee Electric Railroad Company (the Illinois corporation) were on the 25th day of September, 1912, reasonably worth approximately $4,500,000; that the same were offered for sale on said date, under and pursuant to the decree of sale herein, subject to said underlying mortgage of $1,080,000, with interest thereon from July 1, 1912, and subject also to the other liens and charges in said decree of sale mentioned, existing and remaining unpaid at the time of said sale; and that the said bids of said Harry E. Smith and Norman J. Ford, made for and on behalf of said Reorganization Committee, of $50,000 for the west line of said Illinois corporation, and of $1,600,000 for the remaining properties, rights, and franchises of said Illinois corporation described in said decree, were and are, and each of them was and is, insufficient and inadequate; and that such insufficiency and inadequacy in the said purchase prices of the properties aforesaid, bid at such sales, resulted from and were caused by the said stifling, chilling, preventing, and suppressing of competitive bidding at the said foreclosure sales, as hereinbefore found.

"The court further finds that said motions of said Merchants' Loan & Trust Company, as trustee, and of Harry E. Smith and Norman J. Ford, to approve said special master's report of sale and to approve and confirm said sale of said properties, rights, and franchises of said Illinois corporation to said Smith and Ford, in accordance with the recommendations of said special master's report of sale, should be denied, and that said objections, as amended, to said special master's report of sale herein should be sustained, and that the said bids of the said Smith and Ford, and each of them, for said properties, rights, and franchises of said Illinois corporation should be rejected. * * *

"The court further finds that upon the hearing hereof said objector submitted in writing, dated October 8, 1912, the offer of John Griffiths guaranteeing to the court upon a resale of the said properties, rights, and franchises of said Illinois corporation, pursuant to the terms of the decree herein, the sum of $200,000 for said West Line, and the sum of $1,800,000 for the remain-

ing properties, rights, and franchises of said Illinois corporation, accompanied by two certified checks of said Griffiths aggregating $20,000, and to bid said respective amounts for said respective properties upon such resale.

"Whereupon come the said Harry E. Smith and Norman J. Ford, and the said George M. Reynolds, Ernest A. Hamill, W. E. Stavert, Miller Lash, George A. Somerville, Robert Cassels, E. A. Shedd, R. Floyd Clinch, H. S. Osler, and John R. Thompson, constituting said Reorganization Committee aforesaid, and offered to bid for the properties, rights, and franchises of said Illinois corporation the amount bid therefor by said John Griffiths, and moved the court to confirm the sale of said properties, rights, and franchises to said Smith and Ford for the sum of $2,000,000.

"Whereupon said objector presented in open court the written proposition of said Griffiths guaranteeing to bid upon a resale $2,100,000 for said properties, rights, and franchises, pursuant to the terms of the decree herein of February 23, 1912, and accompanied said proposition with an additional certified check of said Griffiths of 10 per cent. of the amount of the increase in said Griffiths' said proposed bid.

"It is therefore further ordered and decreed by the court that said motions of said Smith and Ford and of said Reorganization Committee, constituted as aforesaid, be and the same are hereby denied. * * *

"And thereupon said Smith and Ford and said Reorganization Committee, constituted as aforesaid, without waiving any of their motions heretofore made herein, and without prejudice to their objections to this decree, and for the reason that a resale and the delay incident thereto will entail a heavy loss, cost, and expense upon the bondholders represented by them, and solely to avoid such loss, cost, and expense, now here in open court tender and offer to pay to said objector herein, Matilda W. Moses, the sum of $1,350 in cash for her pro rata share of $450,000, being the difference between the said $2,100,000 bid of said Griffiths and the said bids of said Smith and Ford aggregating $1,650,000, and also to bring into this court, for the benefit of all other holders of bonds of said Illinois corporation who have not deposited their bonds with said Reorganization Committee under and pursuant to said agreement of January 26, 1912, their pro rata share in cash of said difference of $450,000; said tenders and offers being made upon the express condition that said objections of said objector be either withdrawn or overruled.

"But said objector did not accept said offer and tender, and did not withdraw her objections herein.

"And thereupon said Smith and Ford and said Reorganization Committee, constituted as aforesaid, expressly reserving their rights and without prejudice thereto, as aforesaid, and for the reasons aforesaid, moved the court for an order dismissing and overruling said objections of said objector, Matilda W. Moses, upon the payment or tender by them to said objector of said sum of $1,350 and bringing into this court the pro rata share of said difference of $450,000 for the benefit of said nondepositing bondholders, as aforesaid.

"Which said motion was then and there overruled and denied by the court.

"Whereupon said objector entered her motion herein for an order directing a readvertisement and resale of the properties, rights, and franchises of said Illinois corporation under and pursuant to the terms of the decree herein, which said motion was, upon due consideration by the court, granted, and it was further ordered and decreed by the court that Charles B. Morrison, special master in chancery of this court, be and he is hereby ordered and directed to forthwith proceed to readvertise and reoffer for sale at public auction under and pursuant to the terms of the final decree herein, and in the manner and at the time therein directed, the properties, rights, and franchises of said Chicago & Milwaukee Electric Railroad Company (Illinois corporation) in said decree more specifically mentioned and described, and that he report in due course to this court his acts and doings in the premises.

"That said resale shall be in all respects made and conducted as provided in said decree of February 23, 1912, all the terms and provisions of which shall be applicable to such resale; provided that no bids shall be received or accepted by said special master on such resale unless the combined bids for

said West Line of railroad and the remaining properties, rights, and franchises, directed by said decree to be sold, amount in the aggregate to at least the sum of $2,100,000.

"It is further ordered and decreed by the court that said Charles B. Morrison, as such special master in chancery, be and he is hereby authorized and directed to deliver to said Harry E. Smith and Norman J. Ford, if by them requested so to do, the certified checks deposited by said Smith and Ford with said special master in chancery pursuant to the terms of said final decree and aggregating in amount $200,000, being the checks referred to in said special master's report of sales herein.

"And it is hereby ordered and decreed that the said three certified checks aggregating $210,000 heretofore tendered by said John Griffiths, and now in the possession of Joseph W. Moses, one of the counsel of said objector, duly indorsed, be forthwith delivered to said special master in chancery, Charles B. Morrison, to be held by him as a guaranty and as security that there will be bid in the manner required by said decree of February 23, 1912, and pursuant to the terms thereof upon such resale of the said properties, rights, and franchises of said Illinois corporation, as herein directed, the sum of at least $2,100,000 in the aggregate for all the properties, rights, and franchises of said Illinois corporation mentioned and described in said decree, and, upon the delivery of said three checks to said special master, they shall be held by him for the purposes aforesaid, and such delivery shall qualify said Griffiths as a bidder at such resale as provided in said decree."

Levy Mayer, of Chicago, Ill., for appellants.

Joseph W. Moses, of Chicago, Ill., for appellee.

Before BAKER and SEAMAN, Circuit Judges, and CARPENTER, District Judge.

BAKER, Circuit Judge (after stating the facts as above). Appellee has moved that the appeal be dismissed on the grounds: (1) That the decree is not final, and (2) that appellants by offering to meet Griffiths' bid released the alleged errors.

[1] A decree setting aside a sale on foreclosure and ordering a resale confessedly does not end the case. That continues with all the parties in that were in before the sale. But the bidder at the sale becomes a new party; the acceptance of his bid gives him the rights of a purchaser unless legal objections to confirmation can be shown; and the decree which puts him out of court as a party and terminates his asserted rights as a purchaser appears to us very clearly a final decree as to him. No difference is perceived by reason of the fact that the purchaser may have been a party to the foreclosure issues. In the capacity of a purchaser he certainly first became a party when the property was struck off to him at the sale. And here, the Reorganization Committee, representing only depositing bondholders, is not the same party as the complainant trustee, representing all the bondholders. To say that the successful bidder at the first sale may become the purchaser at the second or subsequent sales seems to us no answer. He may not. And the finality of a decree is to be determined by its own force, not by contingencies outside the record. We find nothing in Butterfield v. Usher, 91 U. S. 246, 23 L. Ed. 318, McLish v. Roff, 141 U. S. 661, 12 Sup. Ct. 118, 35 L. Ed. 893, and Doyle v. London Guaranty Co., 204 U. S. 599, 27 Sup. Ct. 313, 51 L. Ed. 641, relied on by appellee, to require a different conclusion; and the numerous cases respecting confirmation may rightly be taken to indicate the general

opinion of the profession that decrees granting or denying confirmation are appealable as final decrees.

[2] If one accepts by his acts a decree against him, he may be estopped from prosecuting an appeal. In this case the sale was set aside because suppression of competition resulted in one inadequate bid. If there was no stifling of intending bidders, the sale should have been confirmed, for a bid of 50 to 60 per cent. of the after-opinion value of property offered at public auction is not shockingly inadequate. By offering to raise their bid, appellants, in our judgment, did not waive their right to insist that they had not chilled the sale. Their conduct was not a confession of wrongdoing; not even, as we regard it, an admission of the inadequacy of their first bid; but amounted at most only to this, that if the objections were withdrawn and the sale confirmed they would pay into court for appellee and other nondepositing bondholders their part of the increase rather than have the estate suffer the expense and loss by delay from a resale, which expense and loss might well exceed the nondepositing bondholders' proportionate share of the increase. Appellants' offer neither advantaged them nor prejudiced appellee with respect to the validity and full operativeness of the decree, and is not, we believe, a sufficient basis for an estoppel against the appeal. The motion to dismiss is overruled.

[3] On the other hand, appellants seek to relieve us from taking up the merits by asserting that appellee was not in a position to object to confirmation. Through a representative appellee had cause to believe that the Reorganization Committee had planned to suppress competition, was present at the sale, and neither bid nor objected to the proceedings. Appellee could not know in advance that the wrongful intent would be acted on. She was under no obligation to bid. And objections should be presented, as she did promptly, to the court, not to the court's salesman. It is also said that Griffiths and appellee had an ulterior purpose to better Griffiths' position as a bondholder of the Wisconsin corporation. We are not now concerned with the Wisconsin case. In the record of these Illinois proceedings we find nothing to impugn the motives of appellee or of Griffiths. But if there has to be a resale or other disposition of the Illinois property, the money of Griffiths or of appellee, even if they were wrongdoers, should be as acceptable as that of the Reorganization Committee whose acts rendered confirmation impossible. At all events, the sale was the court's and we are of the opinion that the court, on the motion of the master or of any outsider or on its own motion, could investigate allegations of actual or constructive fraud in the sale.

[4] Our conclusions respecting the facts may be disclosed most briefly by saying that we approve generally the finding of the trial court and by answering the material objections of appellants to that finding.

It may be true that the Milwaukee Traction Company was eliminated as a prospective bidder when it disavowed the action of Beggs as its president. But Beggs, associating Pfister in the plan, continued the purchase of Illinois bonds and the negotiations for entry into Chicago over the Elevated Railroad until they made their contract with

the Assisting Syndicate. Nothing in the record impugns their ability to maintain their position as intending bidders, and the action of the Assisting Syndicate seems to us a recognition of that ability.

We cannot accept the contention that the Assisting Syndicate's purchase of the 1,647 Dutch bonds destroyed the ability and intention of Beggs and Pfister. That purchase gave the Assisting Syndicate a total of 1,900 bonds. Beggs and Pfister through their ownership of 401 bonds and control of 1,100 by virtue of their agreement with the Illinois Committee, had 1,500 bonds at command. Before the Dutch purchase the Assisting Syndicate therefore had only about 250 bonds. Instead of being a death blow to Beggs and Pfister, the action of the Assisting Syndicate in forestalling Beggs and Pfister in the purchase of the Dutch bonds was necessary to prevent an opposing bidder from having 3,150 bonds against their 250. After the Dutch purchase the two intending bidders were on nearly an equal footing.

Whether the Assisting Syndicate was merely buying bonds or was additionally paying Beggs and Pfister to refrain from bidding and to aid the syndicate and its successors in interest in obtaining the property without competition is to be judged by the contract they made at the time rather than by their subsequent protestations. In the contract Beggs and Pfister gave two things: First, 401 of the 1922 bonds and 530 of the underlying bonds; and second, their agreement that they and their associates "shall, to the extent of their power and influence and information, in every reasonable way, aid and assist the purchasers in becoming the purchasers of the Chicago & Milwaukee Electric Railroad property (both divisions) and in making effective their plan of reorganization," and in consideration thereof the purchasers gave in money and in undertakings to pay $1,122,636. Before this contract went into effect, the Assisting Syndicate apportioned the consideration by obtaining a contract from the Wisconsin Committee that the Assisting Syndicate should be liable for only 65 cents on the dollar of the 401 bonds (which was approximately their value tested both by market price and the worth of the property) and that the Wisconsin Committee should be liable for the excess above that amount. How does the consideration stand when so apportioned by the Assisting Syndicate? Subtracting $538,244 (the highest value of the underlying bonds, and accrued interest) and $260,650 (the amount apportioned to the 401 bonds of 1922) leaves $323,742 as the amount apportioned by the Assisting Syndicate to the other element of the Beggs and Pfister contract, namely, their agreement not only to refrain from bidding but also to use their power and influence and information in aiding the purchasers of their bonds to suppress competition. In percentages these figures mean that 145 per cent. of the face of the 401 bonds was paid, 65 per cent. for the bonds and 80 per cent. for absence and influence.

A further contention in this connection is made that the $323,742 was paid to end litigation. This is but another way of denying that that sum was paid for the absence and influence of Beggs and Pfister, and, as such, is answered by reverting to the only possible meaning of the written bargain and by considering that in fact the outcome of

the sale corresponded exactly with that meaning, namely, the property was struck off to appellants without competition, and not only were Beggs and Pfister absent but through their influence the Illinois Committee had disappeared. Nevertheless we proceed to examine the foreclosure issues in this Illinois case. The trustee filed its bill to foreclose a defaulted mortgage. Neither the Illinois Company nor any of its stockholders was attempting to deny the facts in the bill or the trustee's right to an immediate decree of foreclosure sale. No holder of Illinois bonds was protesting to the trustee or to the court that he had any other or different rights under the mortgage than the other holders of outstanding Illinois bonds. So neither between mortgagor and mortgagee nor between the beneficiaries of the mortgage was there anything to litigate or to delay the decree. Principal and interest of the Wisconsin bonds were guaranteed by the Illinois Company. On behalf of the holders of Wisconsin bonds a general creditor's claim was filed against the Illinois Company on that account. That claim was no defense to the bill for foreclosure and sale; it would attach only to the surplus that otherwise would be returned to the mortgagor; and, since there can be no surplus unless the property shall sell for $6,000,000, it is asking too much to have us believe that any part of the $323,742 was paid to quiet that demand. We find no foreclosure issue to litigate but this: On behalf of the holders of Wisconsin bonds a claim was made that the West Line was built in whole or in part with proceeds from the Wisconsin bonds. If the fact were so found, the issue would be whether the equity of the Wisconsin bondholders was superior to the equity of the Illinois mortgagees. The determination of that issue needed not to delay the order of sale. When there remains no issue between the original parties and an intervener claims title or lien or equity in a relatively small part of the property, experience has generally taught courts of equity not to delay the main case on account of such an intervention, but to order a sale at which the small part shall be sold separately and allow the intervener's claim to attach to the proceeds. And that was exactly what was done in this case. So the only matter to litigate remains in court. And so the delay cannot be attributed to what was obtained in court. It will be noticed that the reserved issue was between Illinois bondholders as such, and Wisconsin bondholders as such. But outside that issue, outside the Illinois court, outside any interest of Illinois bondholders as such, there was a situation to which the Assisting Syndicate was giving attention. When the receivership in this Illinois case began and for some time afterwards, the persons who later came into the Assisting Syndicate were tremendously interested in the $10,000,000 issue of Wisconsin bonds and only trivially in the Illinois bonds. If they had chosen to protect their interests as Illinois bondholders as such and on an equality with Illinois bondholders who had no other interest or motive than to share equally the benefits of the Illinois mortgage, they could have done so by depositing their bonds with the Illinois Committee, which had been organized for the protection of all Illinois bondholders in an equality of benefits and with authority to bid and apply the bonds on the purchase price. If the Illinois property should

fall into the hands of a purchaser in the equal interest of all Illinois bondholders, and the same result should come about in Wisconsin, then the ultimate value of the Wisconsin bonds would depend on the outcome of negotiations between the two purchasers respecting a lease or a consolidation. Manifestly the Assisting Syndicate thought an additional worth could be injected into the Wisconsin bonds by opposing a reorganization of the Illinois property in the equal interest of all Illinois bondholders. And therefore the Assisting Syndicate strove to keep Illinois bonds out of the hands of the Illinois Committee and to get them into their own. At this point the impending competition was between the Illinois Committee and the Assisting Syndicate. Then Beggs and Pfister came upon the scene. If they should become purchasers of the Illinois property they evidently believed they could turn it over to advantage either to the purchaser of the Wisconsin property or to the Milwaukee Traction Company. The Illinois Committee, brought to a standstill by the Assisting Syndicate, formed an alliance with Beggs and Pfister. In this situation Beggs and Pfister were trying to get an order of sale. Why the delay? Not because the case was not as ripe for the decree as it was later, but because the Assisting Syndicate was not ready for the sale under the decree, was not willing to face an equally strong competitor. Examination of the issues in court and what was going on out of court, instead of putting a different face on the contract, only accentuates its meaning.

Appellants say that, although the issue respecting the West Line was not ended in court, it was by a provision in their reorganization agreement to the effect that if appellants should be confirmed as purchasers of the Wisconsin property and also of the Illinois property, then appellants should be judges of the issue. Plainly the issue is not settled. At most, the provision is a conditional substitution of appellants as judges for the judges appointed by law. An indispensable condition is that appellants be confirmed as purchasers of the Illinois property. And when we inquire how they were to become purchasers, we are at once brought back to the $323,742 for the absence and influence of Beggs and Pfister. But even if appellants, by becoming the purchasers, should enter upon their judgeships, they could determine the issue only as between the Illinois and Wisconsin bondholders whose bonds were in their hands. Nondepositing Illinois bondholders, on the question of distribution, would have the right to insist that the court decide whether the proceeds from the sale of the West Line are subject to the alleged claim of the Wisconsin bondholders. Therefore we cannot find that any part of the 80 per cent. premium on the 401 bonds was paid to end the only issue in court.

Although the Beggs and Pfister contract plainly covers two elements of bargain, and although the Assisting Syndicate apportioned 65 cents on the dollar to the 401 bonds, it is claimed that the remainder of the consideration, $323,742, is not to be attributed to the remaining element of the bargain, but to a reimbursement of Beggs and Pfister for services, expenses, and interest on money expended in and about their purchase of the bonds. Beggs and Pfister made no profit, the insistence is, therefore the $323,742 cannot be applied to the second ele-

ment of the contract, but must be wholly and exclusively counted as a part of the purchase price of the 401 bonds. First, the services, expenses and interest in excess of the value of the security were rendered and incurred, in our judgment, not in the purchase of the bonds which were quoted in the market at the price the Assisting Syndicate apportioned to them, but in furthering the enterprise of Beggs and Pfister as intending bidders; second, there is no finding or evidence that the $323,742 represents an actual outlay or a fair estimate of the value of services and the amount of expenses paid or incurred; third, it seems to us scarcely accurate to say there was no profit, when, affirmatively, Beggs and Pfister received interest on bonds in a foreclosure suit that was not collectible in the suit, and when, negatively, they were saved from losses that neither the market nor the property behind the bonds would bear; and finally we deem it immaterial whether the Assisting Syndicate was merely making Beggs and Pfister whole or was paying them an enormous profit, when the only motive we perceive in the surroundings is the very consideration stated in the contract.

That appellants with open eyes stepped into the shoes of the Assisting Syndicate seems to us very clear. The Wisconsin Committee took over the obligation, and therefore the benefit, of the $323,742 part of the Beggs and Pfister contract. When appellants became the Reorganization Committee that was to bid, the Assisting Syndicate and the Wisconsin Committee did not deposit their Illinois bonds as individual holders of Illinois bonds were required to and did deposit theirs, but they bargained with appellants that they would give appellants control of their Illinois bonds if appellants, among other things hereafter considered, would assume the obligation and take the advantages of the existing arrangements. It is unnecessary to weigh the inferences of fact that might be drawn from the record to show that appellants, as intelligent men, with eight out of ten of them taken from previous committees, must have had actual knowledge of every circumstance we have stated; the contents of the papers put in their hands are enough.

$4,500,000 was the value of the Illinois property as found by the court. Detailed estimates of competent engineers, some of the highest valuers being employed by appellants, varied from $3,800,000 to $5,600,000. As the trial judge heard the witnesses in open court, we are in no position to question his finding of value. Subtracting prior liens from the lowest valuation leaves at least $2,600,000 as the value of the Illinois bonds in suit, or 65 cents on the dollar.

From this review we conclude that the court was right in the ultimate finding that the solitary bid was inadequate and that it was solitary on account of suppression of competition.

[5] Against the decision that equity would not tolerate a confirmation of the sale as made by the master, appellant's strong insistence is that the rule in respect to chilling applies only to intending bidders who have no lien or interest in the property. No authority of which we are cognizant goes to that extent. If that were the test, an intending bidder who found competitors in the field with cash in hand could learn how much they wanted for withdrawing and say, "Go get a lien

and then we can consummate our plan without possibility of interference by the court." Decisions are numerous that an owner of a lien, as an incident of his ownership, has the right to sell his lien; that another lienor has as full a right as any one to purchase; that the natural effect is to remove the seller from the field of competition; and that an agreement which expresses the effect that would have followed without the agreement is innocuous. The line is drawn as well as anywhere in one of the cases relied on by appellants (De Baun v. Brand, 61 N. J. Law, 624, 41 Atl. 958):

"On the other hand, the mere possession of a right to protect one's own interest will not be permitted to cloak a violation of the rule under color of such right. Between these two exhibitions of the law lies its true application, which in the nature of things must often turn upon a question of fact."

In legal effect, we believe, Beggs and Pfister were always outsiders. They were confessedly such when, the receivership being under way, they first conceived the plan of becoming purchasers of the Illinois property. Their action began, and continued until they sold out, as a movement, not to protect an existing interest, but to acquire an interest to aid them as intending bidders. When Beggs and Pfister and the Illinois Committee, on the one hand, and the Assisting Syndicate, on the other, were confronting each other as practically equal antagonists, each at a sale was prepared to pay less than half the purchase price in tokens (bonds usable only as advance receipts for their distributive shares) and would have been compelled to produce more than half in money. In the light of the law we see no difference between buying off an intending bidder who has all his money in hand and one who has converted a part of his money into counters.

[6] Another aspect of the matter supports our conviction that the court did equity in refusing to confirm the sale as made by the master. At execution sales and at foreclosure sales of ordinary farms or town lots, 'the general public may in fact be interested as intending bidders because of their separate financial ability to purchase. It was in the consideration of such sales that the ancient and familiar rule arose. But in modern times, when vast railroad and industrial enterprises are financed by selling millions of bonds payable to bearer through the world's exchanges, a different class of sales has appeared. Courts have had to recognize that separate individual ability is not equal to the purchase and rehabilitation of a broken-down railroad. "Reorganization" has become familiar. This means, usually, that the equity of the stockholders, if any ever existed in actual value, has vanished; that the property virtually belongs in equity to the bondholders; and that, if the bondholders will combine for the mutual protection of their equal interest, they will have a practical monopoly of the bidding. This last is so because, if all the bondholders are in the combination, it is utterly immaterial to them whether they bid the full amount of the decree or a sum that will pay only one cent on the dollar of their bonds; and therefore, by creating that masterful situation, they can force any outside combination to offer the full amount of the decree without danger or expense to themselves. Most commonly the controversy over the sale arises when there are nonassenting bondhold-

ers. When such a controversy is on, the chancellor in our opinion not only has the right but owes the duty of being vigilant to see, on the one hand, that a dissenter be not permitted to create a maneuvering value in his bonds by opposing confirmation, and, on the other, that the majority does not use its power, unique in sales of this class, to oppress a helpless minority. Mr. Justice Brewer, in Ballentyne v. Smith, 205 U. S. 285, 27 Sup. Ct. 527, 51 L. Ed. 803, said:

> "That a court of equity owes a duty to the creditors seeking its assistance in subjecting property to the payment of debts, to see that the property brings something like its true value in order that to the extent of that value the debts secured upon the property may be paid; that it owes to them something more than to merely take care that the forms of law are complied with, and that the purchaser is guilty of no fraudulent act."

In Starkweather v. Jenner, 216 U. S. 524, 30 Sup. Ct. 382, 54 L. Ed. 602, 17 Ann. Cas. 1167, the right of a representative of the majority of co-owners to become the purchaser is recognized, provided, among other conditions, "he took no undue or unfair advantage of his co-owners." If, in Northern Pacific Ry. Co. v. Boyd, 228 U. S. 482, 33 Sup. Ct. 554, 57 L. Ed. 931, an outside combination, in competition with the reorganization committee, had been confirmed as the purchaser at $61,500,000, we can hardly conceive that Boyd would have been permitted to go behind the sale. But, because the purchaser had created the masterful situation of controlling the sale, because the purchaser was not a stranger but the virtual owner of the property exposed for sale, neither the principle of the "stability of judicial sales" nor "compliance with the forms of law" nor the intent to commit "no fraudulent act" was sufficient to stop a court of equity from inquiring whether an "undue or unfair advantage" had been taken. Courts of equity should be deemed no less powerful to-day than when the first chancellor looked to his conscience for guidance, to make fair dealing between man and man the test. And from what other source came, or could come, the recognized practice, in sales of this class, of the court's ascertaining in advance of sale the minimum value of the property and thereupon fixing a minimum selling price?

When a nondepositing bondholder objects to confirmation solely on the ground that the reorganization committee's bid, though not grossly inadequate, was substantially short of the fair value, the answer is that his co-owners of the common mortgage and the common decree offered him the opportunity to deposit his bonds and to share equally with them the benefits of the purchase. But, in sales of this class, we never have observed or heard of a case where the minority were turned away without having been given by the majority a fair opportunity to share equally with them the benefits of the purchase—where, for example, 95 per cent. of the bondholders of a vast railroad or industrial enterprise have combined and then shut the door upon the scattered 5 per cent. And no just distinction can be drawn, we believe, whether the door be shut or unconscionable conditions of entrance be imposed.

A reorganization plan is somewhat like an insurance policy or a bill of lading, against which there is no protection except through legis-

lative control of the insurance and railroad companies' offerings. The solitary and distant bondholder must accept the organization plan or let it alone, as it is written. When the unitary property of a single company of the kind in question is to be reorganized, the persons who assume or accept the committeeship, realizing the equality of all bondholders and recognizing that no bondholder has any right to preferential treatment, usually offer a plan that will give the common owners of the mortgage equal benefits through the foreclosure, usually become nothing but the agency through which the bondholders act for their mutual protection. In such a reorganization, if a bondholder does not come through the foreclosure as well off as any other bondholder, it is his own fault. In the case at bar, the Reorganization Committee was not a mere agency for appellee and her fellow Illinois bondholders; under sweeping powers, to be exercised "at its sole discretion," it could buy bonds, take up claims of subordinate right, allow compensation to pre-existing committees and assume their contracts, and do anything and everything it saw fit to do, whether specified or not. Preferential treatment of Illinois bondholders, who were acting in the primary interest of their Wisconsin bonds, was accorded in many ways. The Assisting Syndicate did not deposit its Illinois bonds as appellee was expected to do. Appellants, as has already been pointed out, assumed the contract of Beggs and Pfister. By the reorganization plan the 401 bonds were not only to stand for the same pro rata share of new bonds which appellee was offered, but the sellers were additionally to receive $323,742 in money; and the Assisting Syndicate, for bringing about this situation, was to have $795,500 of the stock of the reorganized company. Creditors, with subordinate rights, were promised $12,500 cash, $63,600 in the bonds, and $24,400 in the stock of the new company. Compensation and expenses, not only of the Illinois Committee, but of the Wisconsin Committee as well, were assumed. Thus the Illinois property, which in equity belonged to the Illinois bondholders in equal right under the mortgage and under the foreclosure decree, would, in the hands of appellant, be loaded down with premiums, bonuses, services, expenses, etc., with which neither appellee nor any other Illinois bondholder as such had any concern. There fore no inequity was chargeable to appellee in asking the court to open a door of fair opportunity.

No matter what the plan, it does not matter whether the committee bids much or little if all the bondholders are in. Here, some $160,000 of bonds were outstanding. And the temptation to use the monopoly of bidding for the purpose of recouping partially the outside expenses and losses of the majority at the expense of the minority seems to have been too strong.

Our conclusion at this point is that the court was warranted in refusing to confirm the sale as made by the master.

[7] When the court had determined to vacate the sale as made by the master, what was to be done? In the case of an original sale the statute seems to be mandatory as to the method. But when a court of equity finds that it cannot confirm a sale as made by its master, we are inclined to believe that the course approved in Blanks v. Farmers'

Loan & Trust Co., 122 Fed. 849, 59 C. C. A. 59, wherein 24 increasing bids were received in open court and the bidding was continued until every bidder had reached his limit, is permissible. That course, however, was not taken by the court in this instance. Instead of receiving Griffiths' proposition to start bidding at a resale at $2,100,000 and his deposit of $210,000 in money, as a bid and a qualification at a sale in court, the court took them as evidence that appellants' bid was substantially short of the fair value of the property and as an assurance that a resale, wherever and whenever held, would be started at $2,100,-000. Nor did appellants follow the procedure in the Blanks Case. They never raised Griffiths' offer. There was no competitive bidding in court. They wrongly assumed that their preferential position as purchasers continued after the court had set aside the master's sale. To attain a standing thereafter they should have asked to have the bidding open in court and should have overbid Griffiths. At any bidding Griffiths' money would be as good as appellants. A court will not look into the conduct of prospective bidders as such; what it wants is bids. The question is whether the method of trying out bidders approved in the Blanks Case was the only one that the court could order. We think not. A discretion in balancing the advantages of a readvertised public sale against the trying out of the proposed bidders then in court, was involved. If the court should hereafter consider that probably no other bidders than Griffiths and appellants would appear at a public sale and thereupon should choose to modify the decree of resale so as to try out the two bidders in open court, we should consider that a matter within the court's discretion. But we have no right to reverse except for error of fact or law, no right to control the court's discretionary choice of one or the other of two permissible methods.

The decree is:

Affirmed.

SEAMAN, Circuit Judge (concurring). The agreement with Beggs and Pfister, mentioned in the foregoing opinion, was obviously made not only for the purchase of their bonds but for the express purpose of preventing them from becoming bidders at the foreclosure sale of the Illinois lines. It was made at the instance and for the benefit of the so-called "Assisting Syndicate," as owners of a large share of the bonds resting alone on the Wisconsin line, to save their interests therein from jeopardy through an independent purchase of the Illinois lines, which was threatened by Beggs and Pfister for annexation to a rival Wisconsin line. So, whatever may have been the benefits of such arrangement to preserve unity of the two mortgaged lines upon foreclosure sale, it may rightly be held that such suppression of a prospective bidder for the Illinois line was prejudicial to the interests of nonassenting holders of bonds applicable alone to the Illinois line. I believe it to be well recognized that reorganizations on the part of bondholders are needful and legitimate means for the purpose of purchasing the mortgaged property at foreclosure sales; that no bondholder can be brought into such reorganization without his consent; that bonds may be purchased of a nonassenting bondholder for the purpose

(express or implied) of foreclosing his objections or attempts to interfere with the reorganization plans; that equality in prices so paid is not, generally speaking, an essential requirement in such transaction; and that suppression of competition, either for reorganization or for the purposes of the sale, which may arise in such purchases or arrangements, neither disqualifies the purchasers to become bidders at the sale, nor, per se, invalidates the sale. Accordingly, in judicial sales of railroad properties these several elements are frequently involved, resulting in a single bid much below the estimated actual value of the properties; and the sale thereupon may rightly be confirmed by the court.

I concur, nevertheless, in each proposition of the opinion for affirmance of the decree appealed from, although I have hesitated over the tenability of the objection founded on the Beggs and Pfister transaction. It cannot be doubted, however, that the trial court proceeded within its authority and duty for the protection of all interests involved, to ascertain whether the foreclosure sale was accomplished equitably, with no unfair advantage taken as against the nonassenting bondholders. Thus, when the transaction with Beggs and Pfister was plainly presented in the character above stated, I am satisfied that confirmation of the sale was rightly withheld, pending the further inquiry whether injury resulted in an unfair bid by the single bidder at the sale; and that the finding of inadequacy and unfairness thereupon should not be disturbed.

Whether the interest of all parties may not be best subserved by reopening the hearing for bidding in open court without the delay of resale by the master is matter entirely within the judicial discretion of the trial court, as I believe; but, if the provision for resale by the master were otherwise open to review in this court, the record furnishes no ground therefor, as well remarked in the opinion for affirmance.