PATRICK HARRIGAN and Others, Plaintiffs, *v.* LEWIS H. POUNDS and Others, Defendants.

Supreme Court, New York County, May 4, 1933.

*Samuel L. Chess,* for the plaintiffs.

*Raphael P. Koenig,* for defendant Committee Service, Inc., and Straus Securities Co., Inc.

*Choate, Larocque & Mitchell,* for defendant Bank of Manhattan Company.

*Baker & Obermeier,* for defendants Baker, Gillespie and Kridel, and Samuel J. Tilden Straus and others.

*Larkin, Rathbone & Perry,* for defendant Central Hanover Bank and Trust Company.

*William J. Mack,* for defendant Reliance Property Management, Inc.

*Wise, Shepard & Houghton,* for defendant Continental Bank and Trust Company.

*Newman & Bisco,* for defendant Harvey Brokerage Co., Inc.

*Battle, Levy, Van Tine & Fowler,* for defendant George Gordon Battle.

*Max D. Steuer [Louis A. Tepper* of counsel], for the independent bondholders' committee.

McCook, J. This is an application for an injunction, inspection and receivership in aid of an action setting up an alleged fraudulent scheme in which the defendants are charged with participation and conspiracy. Among these defendants are certain officers and employees of the Straus companies.

The conduct of some of these officers and employees, before the formation of the so-called independent bondholders' committee, has been on several occasions severely criticized by the courts. The situation now presented calls for a brief historic survey of the Straus enterprises, which I have taken from allegations and admissions in defendants' affidavits upon this motion, from public records and from undisputed documents.

S. W. Straus & Co. was formed in 1882 and is the predecessor in title of defendant S. W. Straus & Co., Incorporated (N. Y. 1926). It long enjoyed an excellent reputation as dealer in selected first mortgage real estate bonds. One cannot be certain from the papers just when the difficulties of the successor corporation began — probably very soon after its incorporation.

In 1926–1928 the defendant S. W. Straus & Co., Incorporated, is shown to have abandoned its predecessor's old course of conservative and candid dealing. It charged, in many cases, what would seem, when compared with results, excessive sums for service, commissions and legal fees, and exercised bad judgment in the underwriting of loans, so that actual rentals and other sources of profit fell below advertising propaganda. Its appraisals, even in that day of inflated values, were on occasion extravagantly high. Its financial faults outran any excuses which might be offered, based on the loose custom of the times.

In about eighty-five per cent of the loans, officers of the house were made trustees of the issues, thus occupying positions of conflicting interest. When properties were permitted to continue to default in their obligations over long periods of time, as was frequently the case, the bondholders of that issue were placed in an unfortunate position should the resources of the company become impaired. No provision was made on the Straus loans to take care of this vital point, nor was there sufficient segregation of the bondholders' money from that of the company. Funds supposedly

received to meet particular obligations when due were diverted to make up deficits or defaults on the part of other borrowers, or for use as additional capital.

The Attorney-General of the State, upon evidence submitted to him, reported in 1929 that "in no case has proper consideration been given to the purchasers of the bonds, nor have they been informed as to the true situation upon making inquiry. The whole policy of the house has been one of misrepresentation in this particular."

What happened during 1929 is not clearly to be separated, in the evidence before me, from the events of the years 1926–1928. Although defaults in interest payments continued, the same safety slogans were, in many instances, pressed upon the credulous by the salesmen, and others, with reckless personal and advertised representations. For years, in spite of offering "first mortgage bonds" and leading purchasers to believe that these were secured by the fee, the Strauses sold bonds which were in fact often secured only by "general mortgages," viz., second, third and even fourth liens, as well as by mortgages on leaseholds. They were generally known to the public and offered for sale as "Straus bonds" by agents who created the impression that they were the direct obligations of the underwriting house, or that it guaranteed their payment. In December of 1929 defendant Amott, then the vice-president and executive sales manager of the corporation, reported to the board of directors: "There is undoubtedly a feeling on the part of many of our good men (salesmen) that they are getting 'blood money,' and the morale is affected accordingly. I have no doubt that many of the men would be content to receive even less if they had greater respect for much of the merchandise we are asking them to sell." After making this report, Mr. Amott was named as trustee of subsequent bond issues. At about this time, in addition to Mr. S. W. T. Straus and Mr. Amott, the defendants F. W. Straus, Roberts, Laun, Ridgeley, Friel, Baker, Gillespie and Kridel, or some of them, were directors, officers or agents of defendants S. W. Straus, Incorporated, and/or its Delaware parent, S. W. Straus & Co., Inc.

During the preceding years the Straus companies had not operated or managed any properties to which the mortgages attached. In August, 1930, the Reliance Property Management Co., Inc., was organized. The information [as to Reliance is obtained from the affidavit of its president, the defendant Kridel, formerly an executive officer of S. W. Straus & Co., Incorporated, and member of various Straus bondholders' committees.

Defaults were increasing in number and amount. Theretofore

the Straus Company had simply covered the defaults. On February 1, 1931, the directors decided to stop payments on defaults.

On September 15, 1931, the Straus National Bank, of which Samuel J. Tilden Straus was president, merged with the defendant Continental Bank and Trust Company, a depositary under the Straus deposit agreements taken over by the independent bondholders' committee. At various dates after February 1, 1931, which do not exactly appear in any of the papers submitted, the defendant S. W. Straus & Co., Incorporated, formed the various "bondholders' protective" committees alleged to be for the protection of holders of defaulted bonds underwritten by the company. The Straus executive officers were designated as these committees. Several of the committees formulated and submitted to the bondholders, as in the *Alden* and *Delmonico* cases, plans of reorganization. In one instance as many as eighty-seven per cent of the bondholders approved. Nevertheless, in the two mentioned matters, when the approval of this court was sought, it was denied — in the *Delmonico* case by Mr. Justice COLLINS on August 4, 1932 (*Bergelt* v. *Roberts*, 144 Misc. 832), order signed August 16, 1932 (N. Y. L. J. Aug. 17, 1932, p. 584); in the *Alden* case by Mr. Justice ROSENMAN on October 19, 1932 (N. Y. L. J. Oct. 20, 1932). The first of these decisions was affirmed by the Appellate Division of this department without opinion (236 App. Div. 777); the second was not appealed.

In rendering his decision, Justice COLLINS held that " the majority are represented by the S. W. Straus interests * * * who, now. that there has been a default, project, sponsor and dominate a reorganization plan." He then further said: " Since a trial on the merits can be had within sixty days, have the plaintiffs presented such a case as to authorize the court to halt further steps under the reorganization plan for that period? I am persuaded that they have. This conclusion does not necessitate disapproval of every item of the plan. I am convinced that its merits are not such as to compel its immediate consummation. Indeed, there is apparent danger that the bondholders' interests will be wrecked. Some of the plan's salient features seem grossly unjust. Others are not free from inequity. I cannot perceive that harm can fall upon the bondholders by deferring execution of the plan until the trial. I can perceive that irreparable wrong might result from precipitous action. * * *.

" The defendants earnestly insist that the plaintiffs are without standing in this court. But the committee defendants have undertaken the execution of a trust. They are fiduciaries, and as such, are amenable to a court of equity. The rights of a minority cannot be annihilated by a self-seeking majority. (*Sage* v. *Central R. Co.*, 99

U. S. 334. * * *) 'Community of interest involves mutual obligation.' (*Jackson* v. *Ludeling*, 88 U. S. [21 Wall.] 616, 622; *Southern Pacific Company* v. *Bogert*, 250 U. S. 483, 487. * * *) The vigilant eye of equity may penetrate the administration of a trust, and its conscience must be satisfied that justice has been done. (*Investment Registry* v. *Chicago & M. E. R. Co.*, [C. C. A.] 212 Fed. 594, 609; [D. C.] 213 id. 492; *Louisville Trust Co.* v. *Louisville, N. A. & A. C. R. Co.*, 174 U. S. 674, 683, 688. * * *) 'A trustee is held to something stricter than the morals of the market place.' (*Meinhard* v. *Salmon*, 249 N. Y. 458, 464; *Munson* v. *Syracuse, G. & C. R. Co.*, 103 id. 58, 74; *Industrial & General Trust* v. *Tod*, 180 id. 215, 225.) "

On October 8, 1932, Mr. Justice NORTON, in connection with a proceeding brought by the Attorney-General under the Martin Act (*People* v. *Straus*), granted an injunction against the Straus Corporation and officers and appointed receivers. (N. Y. L. J. Oct. 8, 1932, p. 1407.) In his opinion he said with reference more particularly to one of the Straus circulars: " ' We regard our interest as identical with the interest of our clients. We represent the investor, not the borrower. It is our fixed policy to protect the interests of our bondholders at all times and under all circumstances.' This promise of protection by which the confidence of the general public was secured was negatived by a subsequent course of conduct characterized by concealment and by a failure to make frank disclosure of existing material facts." (See record on appeal in 236 App. Div. 796, at p. 429.)

It is true that ten days later the Appellate Division, Second Department (*People* v. *Straus*, 236 App. Div. 796), on appeal modified his order by striking out the provision for receivers and somewhat changing the injunctive portion. However, a large part of the injunction, including that which forbade the making of " false representations and pretenses such as are alleged in the complaint " was retained. The majority of the appellate court rendered no opinion. HAGARTY, J., dissenting from the modifications, said: " The defendants, through a course of years, were engaged in merchandising bonds secured by mortgages upon real estate, and established for themselves a high reputation for conservative and honest dealing. * *· * Upon this reputation the defendants traded up to the commencement of this action by the Attorney-General of the State of New York. From high standards and high ideals the defendants have fallen and, in recent years, have engaged in practices which, upon the showing in the record before us, were, in the unanimous opinion of this court, fraudulent,

in violation of law, and operated as a fraud upon the purchasers of many of these bonds, within the meaning of the Martin Act."

One Sonnenschein was a close personal friend and attorney of S. J. T. Straus. In the autumn of 1932 Messrs. Sonnenschein and Straus visited in New York one Weisl, a member of the Illinois bar and a close friend of Sonnenschein. The affidavit of Mr. Weisl, submitted on behalf of the defendant members of the independent bondholders' committee, relates how his visitors complained that the attacks on the Straus organization and committees were shattering their health completely and that they desired an outsider's viewpoint and a friend's counsel and encouragement; that while " officers of issuing houses " had made a practice of serving on bondholders' protective committees, it would be for the best interests of the bondholders and of the Straus organization to have such officers resign from the various " protective committees;" that the properties had to be conserved and the protection continued. " It was definitely agreed that the Straus executives should not take any part in the selection of their successors." He was then asked to find " competent, experienced and independent men to succeed those now serving. Affiant agreed to do so, and invoked the aid of his friends in helping him find these men. Among those whose aid affiant invoked was Mr. Ralph Jonas (of the New York Bar). Many persons were interviewed and finally the present independent bondholders' committee was organized and selected."

The plaintiff's affidavits do not tell us how the independent bondholders' committee was in fact assembled. Mr. Pounds says he was called upon in February, 1933, by Mr. Jonas and solicited to accept the chairmanship. " Mr. Jonas mentioned to affiant the names of various individuals suggested to serve on the Committee," but Mr. Pounds does not say what those names were or who had suggested them to Mr. Jonas. He continues in his affidavit to state that Mr. Jonas then requested Mr. Pounds to suggest names, and that Mr. Pounds mentioned Messrs. Murphy, Battle, Reilly and Tompers. Mr. Werner and Mr. Retz say they were asked to serve by Mr. Max D. Steuer. Mr. Tompers says he was asked to serve by Messrs. Pounds and Jonas; so does Mr. Battle. Mr. Newman says he was asked to serve by Mr. Jonas.

The complaint asserts the existence of a ninth member, one Milton W. Eisenberg. Mr. Pounds in his affidavit strongly denies Mr. Eisenberg's membership, although the name of Mr. Eisenberg appears on Mr. Steuer's brief as one of the committee. There is no affidavit either from Mr. Jonas or Mr. Eisenberg, in spite of the

admitted fact that Mr. Jonas was the principal go-between and the charge that Mr. Eisenberg is a member.

The defendants do not state when the first meeting of the committee took place, nor how many of its members attended; no record is submitted, and very little indication of what they did. The whole account of the independent committee's proceedings since it took hold is quite indefinite.

On February sixteenth the defendant Committee Service, Incorporated, was organized, primarily to be of assistance to bondholders. (Affidavit of Secretary Griffin.) It has been employed temporarily by the independent bondholders' committee to do clerical and mechanical work for the committee under the complete supervision and direction of the committee. He further says that " it would be impracticable for the independent committee to develop a new organization capable of handling the tremendous amount of work involved in connection with the reorganization of approximately $100,000,000 worth of bonds now in default * * *." He shows that " certain persons formerly employed by S. W. Straus & Co., Incorporated, a New York corporation, are employed by Committee Service, Incorporated;" and furthermore, that " certain persons who were formerly officers and directors of said companies are now officers and directors of Committee Service, Incorporated." Also that all its capital stock is now owned by a Delaware corporation, which, according to the affidavit of Treasurer Gillespie of Straus Securities Company, Incorporated, owns all the capital stock of the latter company. Upon the same authority (Griffin) Committee Service, Incorporated, accepts reasonable compensation for its services to the independent bondholders' committee.

On February twenty-fifth the Straus officers resigned from the various protective committees. Whether they resigned all together or separately, and if separately, in what order, does not appear by affidavit. Nor is it clear when or how they elected their alleged successors in interest and function, the defendant members of the independent bondholders' committee. No details of the procedure are given, nor is a record of the minutes or a summary of the business of the alleged meeting submitted. Lack of exact knowledge on this detail is serious, both because of Mr. Weisl's evidence that he, Straus and Sonnenschein " definitely agreed that the Straus executives should not take any part in the selection of their successors," and also on account of the important question, discussed later, whether these Straus committee members, under their agreement with the bondholders, made any proper election of successors. On or about this day S. W. Straus & Co., Inc., sent out a letter to the bondholders informing them of the organization of the independent

bondholders' committee and of the resignation of the officers of the sender, saying that " the experience and knowledge of the Straus organization will be available to the Independent Bondholders' Committee and the bondholders," also recommending that the bondholders who have heretofore deposited their bonds of its eastern issues with the Straus committees co-operate with the members of the independent committee, and that those who have not deposited should do so at once.

On February twenty-seventh the Sun Life Insurance Company, on behalf of itself and other bondholders, instituted action against 1088 Park Avenue, a Straus property, to restrain reorganization by a Straus committee.

On March second the trial of the issues raised in the Attorney-General's action under the Martin Act took place before Mr. Justice Lockwood. Up to this date the Straus committees had continued to accept bonds under the various bondholders' agreements. On March third Mr. Justice Lockwood issued an injunction and appointed receivers of S. W. Straus Co., Incorporated, *on consent*. (N. Y. L. J. Mar. 4, 1933, p. 1300, order signed.) On March fourth the defendant Straus Securities Company, Inc., was organized. In the circular sent out about March eighth by this company to the bondholders, the following language was used to describe its personnel and purposes: " We take pleasure in announcing the formation of Straus Securities Company, Incorporated, to deal in real estate bonds and other investment securities.

" The principal executives and sales representatives formerly associated with S. W. Straus & Co., Incorporated, will be associated with the new company.

" Straus Securities Company, Incorporated, and its officers and employes will be happy to cooperate with and be of service to the bondholders who formerly purchased bonds from S. W. Straus & Co., Incorporated."

On March sixth Committee Service, Inc., began to do business, and so did the Straus Securities Co., Inc. The affidavit of the treasurer of Straus Securities Co., Inc., is interesting in comparison with the affidavit of the secretary of Committees Service, Inc. The first pages are identical, necessarily excepting names, and in substance the affidavits are the same.

It was on March sixth, also, that the defendant Manufacturers Trust Company purchased, through its subsidiary, the defendant Harvey Brokerage Company (and other securiti s) for $250,000. From the affidavit of its president it is shown that this corporation is and always has been in business as a general insurance broker, and that most of the business written has been on property on which

Straus mortgages were issued. Its capital stock was formerly owned by the Delaware corporation, S. W. Straus & Co., Inc., and so remained until sold to a subsidiary of Manufacturers Trust Company.

On March eighth appeared an item in the press regarding the formation and business of the Straus Securities Co., Inc., directed to the public. On March tenth this company wrote to at least one bondholder saying: " The Real Estate Bondholders' Protective Committee will continue to represent holders of 12 East 86th Street General Mortgage and Hotel Lexington First Mortgage 6% bonds, and you need take no action with respect to your bonds of these issues at this time." The same letter further says: " It is probable that the Independent Bondholders' Committee will be requested to represent holders of Bricken Properties Corporations bonds, but you should hold your bonds of this issue until you have received definite advice in this regard."

On March twenty-third a copy of the complaint, served on one of the defendants (which one is not specified), was submitted by Mr. Jonas to Mr. Steuer, who now represents as attorney in this motion the independent bondholders' committee.

The theory of the right of successorship to the committees consisting of Straus executives, maintained by such of these gentlemen as are defendants, is stated or summarized in the brief submitted on their behalf (not by affidavits or other evidence) as follows:

" In each of these cases, in accordance with the terms of the respective deposit agreements, the old members of the committees resigned one by one, and, as they resigned, were succeeded by the individuals who are the same persons constituting The Independent Bondholders' Committee under the deposit agreement of February 25, 1933. Nevertheless, after the change in personnel had been completed, the bonds were and still are held under the *original* deposit agreements by the same depositaries, subject to the same rights of withdrawal by bondholders, so that the only change, insofar as the bondholders are concerned, was a change in personnel of the respective committees. To summarize, therefore, there are still approximately sixty (60) Bondholders' Committees whose members, in each case, are the same as the membership of The Independent Bondholders' Committee created by the deposit agreement of February 25, 1933, but who, in each instance, continued to act under the old deposit agreements. * * * The attention of the court is called specifically to the following language, which is typical of the language of the old Straus deposit agreements, with respect to change in personnel: ' * * * In case at any time any member of the Committee shall die, resign, refuse or become unable

to act, the vacancy thereby caused shall be filled by the vote of the majority of the remaining members of the Committee. Any member of the Committee may be removed at any time by the vote of all the other members, and any member of the Committee may resign by giving notice of his resignation to the Secretary of the Committee and to the Depositary, and the Committee may settle any account or transaction with such member and give full release and discharge upon such resignation or removal. The Committee as at any time constituted, and disregarding any vacancy, shall enjoy all the rights, powers, interests and immunities of the Committee as originally constituted, and so far as appropriate to that purpose the title to any property held by the Committee shall be in the nature of a joint tenancy and not a tenancy in common, with survivorship among members of the Committee upon the death of any of them, and the title of any member of the Committee who may resign, or be removed shall, upon such resignation or removal similarly vest in the remaining members of the Committee.  *  *  *  The membership of the Committee may, by unanimous vote of all the then members, be increased or decreased to such number from time to time as the Committee may decide, and in case of increase, the additional members shall be appointed by the Committee or a majority thereof.'

"It was pursuant to similar provisions in each of the old deposit agreements that the membership of the committees was changed."

The independent bondholders' committee deposit agreement may be summarized by saying that the committee has considered every possible contingency and provided complete protection for itself against the same. On the other hand, I have failed to find any real stipulation for the protection of bondholders; under the agreement they appear, with negligible exceptions, to have no rights which the committee is bound to respect. I mention some provisions.

The committee may act by a majority either at a meeting or by a writing signed by the majority without a meeting, or by a combination; a majority of the members shall constitute a quorum; any member may vote or act by proxy who need not be another member of the committee, and the vote of the proxy shall be effective as the vote or act of the member appointing him; a telegram, cablegram or radiogram sent by a member or his proxy is such a writing; the committee may appoint subcommittees with such powers, discretionary or otherwise, as it may determine, and may procure the performance of any of the matters provided for in the agreement by agents, trustees or substitutes; the committee may delegate to any one or more persons, whether or not members of the committee, "authority to take or refrain from taking any action contemplated

under this agreement, or to exercise on behalf of the Committee all or any part of its powers or rights " under the agreement; specifically the committee has the right and power to vest the management, control and operation of all the properties under the control of the committee in a manager, and to give him such power and to pay him such compensation as the committee may determine.

Whenever deemed necessary or expedient, the agreement may be modified by the committee, or amended, and the judgment of the committee is conclusive as to whether any such change materially alters the rights of depositors.

The right of depositors to withdraw when dissatisfied is made such a difficult and complicated matter as to be almost prohibitory.

The committee is under no obligation to ascertain the existence of conflicts of interest (of the holders of bonds of a particular issue) and the determination of the committee as to what policies to pursue, in the case of such conflicts, shall be final.

The committee is authorized to exercise all the rights and powers of other committees in respect of certificates of deposit issued by authority of the other committees, and deposited with the independent committee under this agreement.

" It is the intention of this agreement to confer upon the Committee all powers which it may deem necessary or expedient in the furtherance of the general purposes of this agreement although such powers be of a character not contemplated at the time of the execution hereof."

The committee is not bound to give an opportunity for the examination of any proposed plan of reorganization to any bondholder or his representative; if it decides to do so and cannot obtain substantial agreement between various groups it may (not must) submit the plan to some appropriate tribunal, such as a judge or former judge, for arbitration and determination of a disputed matter. And, even after the plan has been approved and adopted, the committee may abandon the same without submission to the depositors.

" The Committee undertakes in good faith to endeavor to protect the interests of the Depositors, but the members of the Committee assume no further responsibility." Neither the depositary, the committee nor any of its members or agents are under any duty not affirmatively expressed in the agreement, nor liable except for its own actual bad faith in the discharge of duties or exercise of powers, and more particularly they are to be at all times free from liability in acting upon advice of counsel.

All these provisions favor the committee — substantially none the bondholders. Several of them violate the fundamental principle that a trustee cannot delegate his primary duty to his *cestuis*.

In comparing the Straus committee agreements with the independent bondholders' committee agreement, apart from the points already mentioned, it is perhaps unnecessary to say more than that the latter is even more complete in provisions for the protection of its members than the former. Neither protects the bondholder. Whether the latter should be sustained as between the independent bondholders' committee and the bondholders who deposited directly with it after its formation is not here decided, and the court will not at present enjoin the independent bondholders' committee from dealing with the bonds so deposited.

However, the independent committee asserts in defending this motion the right, as the alleged successor to the Straus committees, of taking over and dealing with under its own agreement the bonds received by the Straus committees under the old agreement. This is a different affair. No matter how the members of the independent bondholders' committee were elected, I hold that they are not, as to such bonds, lawful successors to the Straus committees, assuming that the Straus committees obtained any rights under their agreements. The independent bondholders' committee, as against such bondholders, are mere usurpers and interlopers.

It is said that the members of the independent bondholders' committee are in fact sincere, honest and experienced men. Those personally known to the court are honest and experienced, and undoubtedly sincere in a desire to help the bondholders. Assuming they are all so, the fact remains that they have permitted themselves, as a committee, to become part of a plan which is not for the benefit of the bondholders, but one which retains in the hands of the same Straus interests who were enjoined by the court from acting on any committee, the power by indirection to continue to do so, by accepting what is in effect the old set of agencies.

Take for example Committee Service, Incorporated, which began to do business the day after Mr. Justice LOCKWOOD's injunction order was signed, and has, in part at least, the personnel of the old Straus organization. It is alleged to be, as has already been remarked, a clerical and mechanical organization, and at the same time to be of such a character that the independent bondholders' committee cannot function without it. It has only one client, the independent bondholders' committee.

Only a careful analysis of the undisputed facts, and a marshaling of the necessary inferences to be drawn from these facts, disclose the full truth, but at the end of that process the truth is unmistakable. Whatever, therefore, the gentlemen of this committee may be individually, as a committee they are not independent in any

proper sense, but committed in fact, perhaps without being fully aware of it, to an inequitable and manipulated scheme.

One of the arguments against enjoining any of the activities of the independent bondholders' committee is that chaos would inevitably result. The answer is clear. If the independent committee as such were in fact independent, and the various agencies originally created by or for the Straus interests were as indispensable as they claim, there would be chaos now. If there is peace now, it is because the independent committee, so called, and the agencies mentioned are working hand in glove. If there is to be a righteous peace, the court must step in, thus preventing both inequity and chaos.

According to Nicholas Roberts, long president of S. W. Straus & Company, Incorporated, that company underwrote and sold about 400 issues, amounting to approximately $500,000,000; 189 of these issues, amounting to approximately $186,000,000, were paid at or before maturity. Of the remaining issues, aggregating approximately $350,000,000, a portion has been reduced by serial amortization or by application of sinking funds, and a number of the outstanding issues are today meeting required payments of taxes, interest, etc. We have no present way of knowing, since he does not say, and perhaps does not know, how many of the bonds are in default. One counsel in his brief admits sixty defaulted issues. The proportions of the disaster are sufficiently plain without going into further details. It is impossible for the scattered and confused bondholders to unite in any fashion for its mitigation except through this court. The situation is extraordinary and unprecedented in the form presented. (See Mr. Justice LOCKWOOD's opinion in *People v. Straus & Co., Inc. [Springley Realty Corp.]*, N. Y. L. J. May 2, 1933, p. 2644.)

The independent bondholders' committee plan should be immediately enjoined, and the injunction order should include every defendant (except the banks) and all their respective activities. There will be no gain in waiting for a trial which can but establish the facts and inferences above found and drawn, on evidence substantially undisputed, and after a full hearing. The danger of delay, once the situation is clear, will be equally apparent, for each day that passes means only added expense and commitments, without commensurate benefit, which will under the agreement add to the liens claimed against the bonds. Reference to a court or judge should not here be a matter of grace, but of right. As Judge COLLINS said (*Bergelt v. Roberts [Delmonico], supra*): "What is best for the bondholders is the court's paramount concern." If there be, within the agencies planned and instituted by the individuals composing the Straus organizations, men who are both informed and

disinterested, perhaps they should be employed to aid the bond-holders, but that cannot safely be done except under the court's supervision.

In the eyes of the law, at the moment no trustee for the bond-holders is in existence. The thousands of bondholders look to the court for advice and protection. The Straus committees who felt that " the resignation of these officers alone, without provision for successors, was an unsatisfactory solution of this problem " should have no objection to the appointment of proper successors by the court.. The owners of the defaulted bonds have not received one penny through the efforts of any of the Straus committees or through the independent bondholders' committee. If there is nothing for them to receive, let the court so ascertain. The necessary, and the only practical, solution is to appoint receivers to act in place of the defendant independent bondholders' committee and any claimed predecessors in title, without loss of time, and with full access to lists of bondholders, etc. (Cf. *People* v. *Straus* [*Springsley*], *supra*.)

Settle order providing for an injunction, inspection and the appointment of James W. Gerard, George Frankenthaler and Robert McCurdy Marsh, receivers.