FEARON et al. v. BANKERS' TRUST CO. et al. (two cases).

(Circuit Court of Appeals, Third Circuit. December 19, 1916.)

Nos. 2165, 2172.

RAILROADS ⚙⟾196—RECEIVERSHIP—REORGANIZATION.

An order confirming a master's sale of railroad property, which had been in the hands of receivers for eight years, affirmed, where the sale was pursuant to a plan of reorganization approved by the holders of $25,000,000, out of a total of $30,000,000, of first mortgage bonds, and opposed only by the holders of the remaining bonds of the same issue, such bondholders being the only persons having any practical interest in the property, and where the plan, while involving a heavy assessment on the bondholders, was open to all alike, and commended itself to the

⚙⟾For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes.

court as the only practicable one by which any considerable part of their investment might be saved.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 659–661; Dec. Dig. ☞196.]

Appeals from the District Court of the United States for the Western District of Pennsylvania; Charles P. Orr, Judge.

Suits in equity by the Bankers' Trust Company to foreclose mortgages of the Wabash Pittsburgh Terminal Railway Company and the Wabash Pittsburgh Railway Company. Charles Fearon and others, composing a bondholders' committee, appeal from an order refusing them permission to intervene, and from an order confirming a sale of the property. Affirmed.

Gifford K. Wright, of Pittsburgh, Pa., Frank B. Bracken, of Philadelphia, Pa., and Charles J. Bonaparte, of Baltimore, Md., for appellants.

William W. Green and Arthur H. Van Brunt, both of New York City, for appellees.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

BUFFINGTON, Circuit Judge. This case concerns the winding up of what may be called the Pittsburgh Wabash Railroad receivership. It comes before us in two phases: One is an appeal by certain first mortgage bondholders, represented by the Fearon committee, from an order of the court below refusing to allow them to become interveners; the other, their appeal from an order of said court dismissing their exceptions to, and confirming, a master's sale of the receivership property. The two cases were presented and heard separately, but as the parties are the same, and as they in substance involve the same matters, we consider and dispose of them both in the present opinion.

In the final analysis the question before us is whether the master's sale should be set aside. This fact makes it needless for us to discuss the alleged error of the court in denying the Fearon committee's petition to intervene, for in the full hearing of the cause, which this court has invited and has given, we have for all practical purposes afforded that committee as broad rights, status, and judicial consideration as though their petition to intervene had been granted and they had all the rights of a party litigant.

Addressing ourselves, therefore, to the crux of this controversy, let us inquire whether ground has been shown of such moment as to constrain this court to set aside a sale at the instance of a committee representing approximately some $5,000,000 of bonds, when two other committees, representing approximately some $25,000,000 of bonds of the same issue, are urging such sale, and where such majority bondholders, by assessing themselves and paying in practically $300 on each $1,000 of their bonds, have thus given earnest of their conviction that in no other way than the sale made can this property be disposed of and this receivership terminated.

A patient study and full consideration of the subject has irresistibly led us to agree with the view taken by this large majority of the

bondholders, and we may further say we are satisfied that, without the furnishing of some such substantial sum as has been raised by this heavy bond assessment, no effective reorganization of this property could be made by any future plan. Moreover, it will be observed that this case is not one between the usual conflicting classes of creditors, bondholders of different issues, stockholders, etc., whose contentions and relative rights in foreclosure proceedings make the balancing of their relative class rights a matter of grave difficulty. The situation is here different. This is wholly a question between those of a single class, viz., the first mortgage bondholders, for it has now become clear that they, and they alone, have any practical interest in this property, and the question is: How shall the interest of that whole class of such bondholders be worked out by themselves? For it is also manifest that, being the sole parties in interest, they must work out that outcome themselves. The question, therefore, narrows itself to the business proposition: First, is this majority plan of reorganization, of which this sale is a step, fair to the minority; and, secondly, if this plan of reorganization is rejected, and the bondholders supporting it in effect disorganized and scattered, what other and better plan is possible, probable, or suggestible?

That the plan proposed may be taken advantage of and participated in by all the bondholders, including these exceptants, and that, in the event of the confirmation of this sale, every such outstanding bond-holder, every second mortgage bondholder, and, indeed, any person who desires, can avail themselves of the privilege of participating in it on the same footing as the majority bondholders, in itself shows that the plan proposed is fair and equitable, in that it treats alike all parties interested therein. In other words, the majority bondholders in effect have afforded the minority an equality of participation, conditioned on the fair and equitable condition that the minority equitably share the financial burden that alone makes any reorganization practical. To this answer is made that a $300 assessment on a $1,000 bond is a burden which no bondholder ought to have imposed on him, and is one which probably some of them cannot meet. We recognize the hardship of the situation, but the court is here dealing, not alone with the disappointed expectations of these minority bondholders in their original investment, but with the present practical question: What can be done to work out as much salvage as possible for all the bond-holders from the property they hold as security, which is now in the court's charge?

When a great majority of such bondholders, dealing fairly with all others, say to a court: This is our only possible salvage plan; the necessity of salvage is such that, to save our original investment, we have felt constrained to add $9,000,000 to our original $30,000,000—a court which denies to such self-assessing bondholders the right in their own way to conserve and salvage their own security is assuming a grave responsibility. To warrant it rejecting such proposed plan, a court should have a clear and reasonable probability of some other plan or course which would bring better results to these bondholders as a whole. And when it is considered that the minority bondholders

practically indicate their unwillingness or inability to pay a rate of assessment which is made lower by its being shared by over $20,000,000 bondholders, what reasonable hopes can they hold out to the court that they themselves will consent to any plan that calls for any assessment? But that this property can be reorganized, that other property, the very links required to its being made a dependable workable whole, can be acquired, and other necessary steps taken, without the substantial contribution of the new capital which the majority bondholders have assessed themselves to provide, is so clear that any other theory of reorganization may be dismissed as impractical.

Seeing, then, that the plan proposed is fair and equitable, and that it is open to all bondholders, and carries no exclusive privileges to those urging its adoption, we turn to the next question: What other and better plan is possible?

The fact that after the many years of this protracted receivership no other workable plan has been suggested is in itself persuasive that no other was possible. And why this is so will be clear, when the situation confronting these bondholders and the court as the administrative guardian of their property is rightly understood. Without entering into minor details, we confine ourselves to the more substantial features. This receivership was begun in 1908. Seven years later, in August, 1915, this Fearon committee was formed; eight years later, in May, 1916, it sought to intervene. During these intervening eight years, none but the present plan has taken practical form, although during all those years large numbers of the first mortgage bondholders have been active in an effort to protect their interests. There were outstanding $30,000,000 of first mortgage bonds, and a protective committee, called the Wallace committee, was formed shortly after the receivership, with which was deposited somewhat over $28,000,000 of such bonds. Subsequently some of these Wallace bondholders withdrew their bonds, and with some outstanding bondholders formed, in 1910, the Chaplin committee, which represented $10,000,000 in bonds. These two committees worked separately, with different ends in view, for several years, when the inevitable logic of the situation drove the two committees to unite and form the joint reorganization committee, which is now carrying out the plan of reorganization, of which the present sale is a step.

On June 28, 1915, this joint committee made public a proposed reorganization plan which called for an assessment of $300 on each accepting $1,000 bond, and required for its consummation the raising by such assessment to the extent of $9,000,000. This plan, it will be observed, required the participation of $30,000,000, or the whole of the bondholders. It was not successful, for the manifest reason that the $30,000,000 bondholders would not or could not pay the assessment required to provide the $9,000,000 necessary, and it was therefore followed, January 10, 1916, by an amended plan which provided for an underwriting to the extent of $5,000,000, whereby the underwriters were to subscribe for and get securities of a new organized company, with commissions of $500,000. The effort of these committees to evolve some plan was, as it will appear, done under constraint of a

constant effort of the court to wind up this long-protracted receivership. As early as January 3, 1913, that court entered a decree in foreclosure on the mortgage securing these bonds, and directed that a sale be made by the master at a time to be appointed by him. By this sale order an upset price of $6,000,000 was required. It left the date of sale open until such time as the bondholders could agree on a plan of sale. This order of sale was delayed more than three years by the inability of the bondholders to work out any plan of reorganization. In the meantime, and during these long delays of the bondholders, the court had at their instance granted to its receivers the right to issue receivership certificates for substantially $3,100,000. In the course of time these certificates became overdue, and some of their holders were, by petition, urging their payment.

It will be noticed the upset price of $6,000,000 had been made in the decree of sale; but as no time was set for a sale, and no plan had been formulated for reorganization, it would seem that such figure was not set on the basis of any then existing plan of sale, but rather as a proposed basis on which a plan might be worked out, and was made in view of the price at which the bonds were then selling. Treating it as such, the court below, by a modifying order of May 15, 1916, reduced the upset price from $6,000,000 to $3,000,000. This action by the court below clearly fell within the range of the discretion vested in courts in such matters, for it will be manifest that, while the net result of the payment of the upset price of $3,000,000 was that nonparticipating bondholders would realize approximately 10 per cent. of their bonds, and that assenting bondholders were willing to allow what is conceded to be an extraordinarily heavy assessment to be applied to that extent, it was no doubt apparent to the court that, if the upset price was fixed at double that sum, a large number of bondholders who were content to assess themselves up to $300 per bond would refuse to join in a plan which, to provide for such increased payment to nonparticipating bondholders, must correspondingly provide for a larger assessment on the participating ones. Moreover, it must not be overlooked that this order of May 15, 1916, by the lowering of the upset price to $3,000,000, made it possible for the Fearon committee, the exceptants, to qualify as a bidder at the sale, and prevented such committee from being shut out as a bidder, which it would have been, had the $6,000,000 price been allowed to stand.

Turning, now, to the Fearon committee, we find it was formed in August, 1915. It represented $450,000 free bonds and $3,500,000 of certificates issued to bondholders who had previously deposited their bonds with either the Wallace or Chaplin committees. The year thereafter intervening before the sale was made afforded reasonable time for the development of some plan, but the year passed without the submission of any plan whatever by that committee. And in that connection an inspection of the instrument creating the committee shows that no provision was therein made for carrying into effect any plan of reorganization, or, indeed, formulating one for submission to the court. True, the suggestion is made by the exceptants that this property could be sold in separate parcels; but, apart from such plan not commend-

ing itself to the court below nor to us, it does not commend itself to the large majority of the bondholders, who feel that the best course is not only to hold the property covered by their bonds intact, but by the assessment to provide for the acquisition of such other properties as will round out and link up with the mortgaged part. Indeed, we may here say that, in so doing, this reorganization plan is in a general way now doing what, if it had been originally done, would have tended to make a more stable security for these bondholders. To do that now the heavy assessments made or underwritten are required and are being applied. Without entering into minor details, it suffices to say that, after applying some $3,500,000 to receivers' certificates and obligations, which, of course, had to be met in advance of bondholders' rights, substantially $4,000,000 more in cash were necessary to acquire property not covered by the mortgage, but which was required to round up and make of unitary value the property secured by the mortgage. The lack of this property is what, in part, weakened the supposed security of the original investment; its ownership is necessary to any stable scheme of reorganization suggested.

Viewing the case as a whole, and in all its broad aspects, we are of opinion the court below committed no error in confirming this sale and taking steps to wind up this receivership. The present unfortunate situation was created by the bondholders in their original investment, and the duty of the court below was to now dispose of the insufficient security they had taken to the best possible advantage. This task we are satisfied it has done with great patience and with business ability. At the instance of different parties, ample time was given for taking full testimony, and everything bearing on the properties was brought to light. At the suggestions of the committees representing the bondholders, additional equipment and transportation facilities were from time to time provided by receiver's certificates. Leeway of time for the formation of plans of reorganization was afforded to a point when the holders of receiver's certificates became clamorous for their money. In insisting on a sale now, the court has deferred action to a time when credit was not strained and the financing of a reorganization was feasible. There is no certainty that any future time would be more opportune; there may be danger that if this sale were set aside, and months, if not years, elapse before another plan was evolved, the last state of the bondholders might be worse than the first.

In view of all these considerations—that the great majority of the bondholders favor this sale; that all bondholders, whether in favor of the sale or objecting to it, will have an opportunity of sharing on equal terms in the reorganization—we are of opinion the court below committed no error.

The decrees below are therefore confirmed, and the cause remitted to the court below for further proceedings.