First National Bank of Chicago, Appellee, v. Bryn Mawr Beach Building Corporation et al., Appellees.

Holman D. Pettibone et al., Appellees, v. Bryn Mawr Beach Building Corporation et al., Defendants, on Appeal of Bernard D. Harris et al., Appellants, and Alvina Schneler et al., Co-Appellants.

Gen. No. 38,246.

268

Opinion filed January 13, 1936.

Shulman, Shulman & Abrams, Ward, Curtis & Polin, Aaron Soble and Harry Abrahams, all of Chicago, for appellants; Meyer Abrams, of counsel.

Miller, Gorham, Wales & Adams, of Chicago, for appellees.

Mr. Justice Friend delivered the opinion of the court.

Subsequent to the entry of a decree of foreclosure and sale by the superior court an intervening petition was filed by a protective committee, after the term in which the foreclosure decree had been entered, to construe the terms of a deposit agreement, approve a plan of reorganization and confirm the foreclosure sale held in pursuance of the plan. Before the confirmation of the sale one of the nondepositing bondholders filed a petition asking that the foreclosure proceeding be con-

solidated with a suit for the liquidation of the mortgagor corporation which had been filed in the same court prior thereto. The court permitted the filing of the petition but denied the prayer thereof, approved the report of sale and with certain modifications also the plan of reorganization submitted by the committee, directed the trustee, who had been in possession of the property during the pendency of the suit, to file a report and account of its operations, and to distribute the net operating income on hand pro rata among all the bondholders. From that order certain objecting bondholders, who will hereinafter be referred to as respondents, have prosecuted this appeal.

It appears that October 1, 1931, the mortgagor, Bryn Mawr Beach Building Corporation, paid the instalment of interest which became due on that date on all outstanding bonds, but failed to pay the $200,000 principal amount of bonds which had then matured. December 17, 1931, the default having continued for more than 30 days, the trustee, in accordance with the provisions of the trust deed, accelerated the maturity of all outstanding bonds, aggregating $6,000,000, and filed its bill for foreclosure. A foreclosure decree was entered February 20, 1934.

During the pendency of the proceeding the trustee operated the mortgaged property for the benefit of all bondholders. The mortgagor corporation and the tenants of the building were designated as defendants in the foreclosure suit, and David H. Brill, who was appointed by the court as attorney for the nondepositing bondholders, appeared before the master to whom the foreclosure proceeding had been referred and the court on behalf of nondepositing bondholders throughout the proceeding. January 11, 1935, the master published notice that the foreclosure sale would be held February 4, 1935. January 17, 1935, the trustee caused notice of the time and place of the sale to be mailed to

all nondepositing bondholders. Harold C. Bull, acting as the nominee for the protective committee, bid in the property for the sum of $1,040,225.

Thereafter, February 9, 1935, the committee filed its petition averring in substance that it represented the holders of $5,183,400 of the outstanding bonds and that it had caused Bull to bid at the master's sale as its nominee; that it had on December 18, 1934, formulated a plan of reorganization for the property in connection with its bid at the foreclosure sale, and that it desired the court to consider the plan, notice of which had previously, on December 18, 1934, been sent to all nondepositing and depositing bondholders; that it desired the court to determine whether the plan was fair, equitable and just and within the rights and powers fixed in the deposit agreement under which the committee was acting; that it desired the court to supervise the consummation of the plan and accord to all bondholders who had not previously deposited their bonds an opportunity to participate in the plan upon such terms as the court might direct. The court allowed the committee to file its petition, authorized the issuance of process to certain depositing bondholders as representatives of all depositing bondholders and to certain nondepositing bondholders as representatives of that class. By the same order the court set the master's report of sale and the petition for hearing March 20, 1935, and directed the master to notify all depositing and nondepositing bondholders of the time and place of the hearing, and that they might on that date present objections to the confirmation of the sale or to the plan of reorganization. Pursuant to that order the master sent a notice to all bondholders February 16, 1935, advising them of the hearing upon the proposed plan and confirmation of the foreclosure sale, and that any bondholder might file objections thereto and be heard by the court. When the matter came on

for hearing March 20 and 21, 1935, certain evidence was introduced by the committee and by respondents, and bondholders were advised that the committee would welcome any changes in the plan of reorganization which the court might consider advisable for their protection. The court then took the matter under advisement until April 3, 1935. On that date Bernard D. Harris filed a petition asking that the foreclosure proceedings be consolidated with a suit for liquidation of the mortgagor corporation which he had filed in the superior court February 28, 1935. When his petition was presented no process had been served upon the mortgagor corporation in the liquidation suit, and it was not at issue. The court permitted the filing of the petition, but denied the prayer thereof, entered an order approving the report of sale, the plan of reorganization submitted by the committee with some modifications, and, as heretofore stated, directed the trustee to account, provided that objections to its account be filed within a short date and ordered the distribution of the net operating expenses pro rata among all bondholders.

The property under foreclosure consists of a 19-story and basement apartment hotel, located at 5555 Sheridan road, adjoining the Edgewater Beach Hotel. The building contains a total of about 1,550 rooms, composing apartments of various sizes, mostly unfurnished. There are numerous shops on the street level, the building contains a large garage, swimming pool, dining room, barber shop, beauty parlor and commissary. A total of 7,754 bonds, for the aggregate principal amount of $6,000,000, were issued and outstanding against the property. When the reorganization plan was announced, December 18, 1934, more than 3,150 persons had deposited bonds aggregating $5,183,400 with the committee, and some 750 persons had not deposited their bonds.

Respondents advance two major contentions for reversal of the court's supplemental order or decree. It is first urged that the court lacked jurisdiction to pass upon the plan and to construe the deposit agreement, after the expiration of the term during which the foreclosure decree was entered. Respondents take the position that the committee's petition was filed as a pretext for invoking the court's jurisdiction to construe an agreement which was in nowise ambiguous and required no construction or interpretation; that the decree became final February 20, 1934, and the court reserved jurisdiction therein solely to pass upon the approval of the sale and the trustee's accounting or to enforce the provisions of the decree; and that since none of these matters was made the subject matter of the petition the court was wholly without jurisdiction to entertain the intervening petition after term.

It may be conceded that this was a final decree. (*Myers v. Manny,* 63 Ill. 211, 213; *Kirby v. Runals,* 140 Ill. 289, 295.) Respondents cite two Illinois cases and one recent decision of the Circuit Court of Appeals (U. S.) for this district, to support the contention that the court lacked jurisdiction. In *Totten v. Totten,* 299 Ill. 43, a decree provided for the payment of certain money found due under a warranty deed which was held by the decree to be a mortgage. After prosecuting an appeal from the decree, which was affirmed, a petition was filed in the circuit court to extend the time within which to pay the sum specified in the decree, and the court granted the extension. The contention was made that the court was without jurisdiction of the subject matter and had no authority to extend the time for payment, because the term at which the original decree was entered had expired. It was held that while usually a court of equity has no power, after final decree, to amend, modify or alter the principles of the

decree, the court retains and possesses the power to control the time and manner of the execution of its judgments and decrees.

*Haase v. Haase,* 261 Ill. 30, was a partition proceeding. Appellant claimed to have purchased the premises and to have the right to have the title conveyed to him. It appears from the decision, however, that he knew of the pendency of the suit before decree, but did not choose to intervene at that time and become a party to the proceedings as he had a right to do. After decree he sought to intervene and the court said it was then too late; that after a cause has been heard and determined between the parties there can be no intervention by a third party, and that any rights he may have must be made the subject matter of an original proceeding.

In *Sorenson v. Collins,* 77 F. (2d) 166, a final decree of foreclosure had been entered in the circuit court of Cook county, and thereafter the mortgagor filed a petition in the U. S. District Court, under section 74 of the 1934 amendment to the Bankruptcy Act, alleging that he was unable to meet his debts and that he desired to effect a composition or extension of time within which to pay the same, and seeking an injunction to restrain the foreclosure sale in the state court. The amendment to the Bankruptcy Act contains a proviso that it shall not affect proceedings in which a "final decree" has been entered, and the circuit court of appeals simply held that the federal court had no jurisdiction to stay the proceeding in the State court because the decree there entered was "a final decree."

Under the decree of the superior court, entered February 20, 1934, in addition to each and every other provision made for the execution and enforcement thereof, the court reserved to itself full and complete jurisdiction of the cause for certain specified purposes, and "for the purpose of entering such other or further

order or orders not inconsistent with this decree as to the court may seem necessary or proper.'' The question therefore arises whether, under the terms of the decree and the general powers which a court of equity possesses to enforce the execution of its judgment orders or decrees, it had jurisdiction to entertain the petition and in connection with the motion for confirmation of the sale to pass upon the fairness of the reorganization plan and the powers of the committee, under its depositary agreement, to carry out the plan.

The adequacy of bids in connection with foreclosure sales has presented serious difficulties to courts during the years of depression. The question frequently arises whether the bid adequately represents the value of the property being sold. In the case of large foreclosures it has been difficult, if not impossible, to obtain cash bids commensurate with appraisals and values established during the years of prosperity. Competitive bidding at foreclosure sales has been almost unknown. Accordingly, various forms of reorganization have been employed to secure for bondholders securities offering reasonable probabilities of future return on their investments. In this connection bondholders' committees have been created and plans presented to the courts for approval in connection with foreclosure sales. Usually the question of jurisdiction has not arisen because under the better practice employed in both state and federal court reorganizations, the machinery for determining the fairness of the plan has usually been set up by the foreclosure decree, and final approval of the plan has been specifically reserved until after sale. In the case of railroads, utilities and other large reorganizations effected in the federal courts, in some instances reorganizers have submitted their plan and procured a determination of its fairness in advance of the decree or of the sale. (*Habirshaw Electric Cable Co. v. Same,*

296 Fed. 875.) While such procedure may be of considerable advantage to reorganizers, because it eliminates any possibility that the sale may be upset and a resale made necessary in the event the plan should not prove to be equitable, there is some doubt whether in advance of sale the question of the fairness of any particular plan may not be moot, and hence such a determination at that stage not binding. (Swaine on Reorganization of Corporations, vol. 27, Columbia Law Review, 901; *Guaranty Trust Co. v. Missouri Pac. Ry. Co.*, 238 Fed. 812.) It has, therefore, become the established practice under the decisions of recent cases to determine the fairness of the plan upon application for confirmation of the sale pursuant to the plan. This practice was developed prior to the enactment of amendment 77-B and rests upon the inherent equity powers of the court as appears from the following decisions. (*Guaranty Trust Co. v. Missouri Pac. Ry. Co., supra; Westinghouse Electric & Mfg. Co. v. Brooklyn Rapid Transit Co.*, U. S. District Court, S. D. N. Y. Cons. Cause Eq. No. E-15-37, not reported; *Central Union Trust Co. v. Missouri, K. & T. Ry.*, U. S. District Court, E. D. Mo., E. Div., Cons. Cause Eq. No. 4564, not reported; *North American Co. v. St. Louis & S. F. R. R.*, U. S. District Court, E. D. Mo., E. Div., Cons. Cause Eq. No. 4174, not reported.) Under the cases cited by the parties hereto, that procedure was usually followed.

The decree herein reserved jurisdiction for certain specified purposes and for the purpose of entering such other or further orders not inconsistent with the decree as to the court might seem necessary or proper. Notwithstanding the absence of a specific reservation in the decree to consider and pass upon the equity of the plan, we think the supplemental order was within the reservation provided. The decree ordered the property to be sold, and of course retained jurisdiction

to pass upon the master's sale thereof. Since the sale was but a step in connection with a plan for the reorganization of the property, the court could not very well have disassociated the plan from the bid price. Judged by standards of values existing during prosperous times, cash bids at recent foreclosure sales have generally seemed inadequate. Therefore, in determining whether the sale should be approved, the court had of necessity to inquire into the equity of the plan, as it affected the interests of all parties whose rights the court was bound to safeguard, to determine whether the sale was fair. Some 86 per cent of the bondholders had deposited their bonds in pursuance of the plan of which they had full notice. The nondepositing bondholders also had notice of the plan, for on December 18, 1934, several months before the committee's petition was filed, they as well as all depositing bondholders were notified that a plan had been formulated for the reorganization of the property in connection with the bid at the foreclosure sale. All parties who objected to the sale and the plan were afforded an opportunity to be heard. The court also considered the alternative plan proposed by a small minority of bondholders. After hearing, the committee's plan was approved and the sale had in connection therewith was confirmed. In the supplemental decree entered by the court the principles of the original decree were in no way changed, modified or altered, and unless it be held that courts of equity wholly lack the power to consider and approve or reject plans for the reorganization of properties in connection with foreclosures, the reservations in the original decree herein sufficiently vested the court with continued jurisdiction to enter all orders necessary for the protection of parties in interest and in aid of the execution of its decree. The jurisdiction of the court was similarly challenged in *Chicago Title & Trust Co. v. Bamburg,* 278 Ill. App. 1,

and the court, in discussing the question under consideration, said (p. 12):

"In behalf of the appellants it is urged, in the first place, that the decree entered in 1931 was a final decree; that the supplemental decree thereafter entered undertook to materially vary the terms and provisions thereof, and that the court was wholly without jurisdiction to do this after the term had expired at which the decree was entered. We are not impressed with this contention. The original decree reserved jurisdiction for certain purposes, and the supplemental decree was within the reservations thus provided. It is the general rule, as appears from the cases cited in the briefs, that the limitation of control of the court to the term at which the decree was rendered does not apply to the provisions inserted for the purpose of carrying the decree into effect. *Sterling Nat. Bank v. Martin,* 213 Ill. App. 566. To the same effect are *Mariner v. Ingraham,* 230 Ill. 130, and *Totten v. Totten,* 299 Ill. 43." The *Bamburg* case was later reversed by the Supreme Court, but not on jurisdictional grounds.

In *Eggers v. Adler,* 248 Ill. App. 118, the question arose as to whether the court had jurisdiction to entertain a cross-bill, the term of court at which the original decree of foreclosure was entered and the master's report of sale approved and affirmed having expired, and it was held that (p. 125):

"While the decree of foreclosure and sale is a final one, it does not necessarily dispose of all the issues in the case or the subject matter of the suit. As to undisposed of matters, the jurisdiction of the court would continue until the whole matter is disposed of, although, of course, further proceedings would not be allowed to change or modify in any way the final decree theretofore entered. The jurisdiction of the court of chancery over undisposed of matters does not end at the expiration of the term at which a particular final

decree may be entered. We think the court was not without jurisdiction and that the order was equitable and just, and it is affirmed.''

The more vital question involved in this proceeding is whether a court of equity will in any event entertain jurisdiction to consider and pass upon the equity of a reorganization plan in connection with the sale of property in foreclosure proceedings. Reorganizations under the statutes of England and Canada, where they are generally called ''reconstructions,'' differ somewhat from the procedure in this country, in that they are accomplished by a decree of court approving a plan agreed upon by a specified part of the bondholders and upon approval it is binding on all the stockholders and creditors. These statutory reorganizations of railroads in England and Canada take the place of foreclosure sales in the United States which in general accomplish substantially the same result with more expense and greater delay. (Fletcher Cyclopedia of Corporations, vol. 15, sec. 7273.) Under a recent amendment of the Bankruptcy Act (section 77-B, 11 U. S. C. A.) similar to the British Companies' Act, the federal courts in this country have been especially empowered to entertain jurisdiction for the purpose of passing upon reorganizations. Security holders are allowed to express their attitude toward the plan and it is possible to bind dissenting bondholders.

Many years prior to the enactment of this statute, however, the federal courts, under a long line of decisions, sanctioned the method of reorganizing defaulted bond issues by the purchase of the property under foreclosure at judicial sale through a committee acting for all bondholders who desired to participate in a reorganization of the property. (*Shaw v. Little Rock & Fort Smith Ry. Co.*, 100 U. S. 605; *Habirshaw Electric Cable Co. v. Same*, 296 Fed. 875; *Fearon v. Bankers Trust Co.*, 238 Fed. 83; *Guaranty Trust Co. of New York v. Missouri Pac. Ry. Co.*, 238 Fed. 812; *Phipps*

*v. Chicago, R. I. & P. Ry. Co.*, 284 Fed. 945; *St. Louis-San Francisco Ry. Co. v. McElvain*, 253 Fed. 123; *Graselli Chemical Co. v. Aetna Explosives Co.*, 252 Fed. 456.) The policy of the federal courts toward reorganization of properties in foreclosure and other suits, solely on equitable grounds, is well expressed in *Graselli Chemical Co. v. Aetna Explosives Co., supra,* as follows:

"A court of equity's modes of relief are not fixed and rigid. It can mold its remedies to meet the conditions with which it has to deal." Mr. Justice Ward, in his dissenting opinion in that case, stated the principle more definitely by saying that:

"When a court is selling the whole property of a corporation under a decree of foreclosure, with a view to distributing the proceeds of sale among the parties entitled, it may properly look into the fairness of any plan of reorganization under which the property has been purchased or is proposed to be purchased. In other words, the court will affirm the sale if the terms of the reorganization agreement are fair, and will refuse to do so if they are not."

Courts of other States have followed this practice upon the assumption that courts of equity have the inherent power to consider reorganization plans in connection with foreclosure sales. In *Clinton Trust Co. v. 142–144 Joralemon St. Corp.*, 263 N. Y. S. 359, decided in March, 1933, the court was confronted with the question whether it could properly consider a plan of reorganization in the pending foreclosure proceeding, and in holding that it had such power, said (p. 364):

"The way is not unblazed if it be thought that we are pioneering in a new field. In the federal jurisdiction it has been comparatively common for courts to take cognizance of reorganization plans in foreclosure and other suits, and to withhold judgment or confirmation of a sale until some fair and open plan of reorganiza-

tion was presented and substantially agreed upon. . . .''

The same court in *Chase Nat. Bank v. 10 East 40th St. Corp.*, 264 N. Y. S. 882, decided in June, 1933, considered the question involved and in holding that it had the right to pass upon the plan of reorganization, said (p. 888):

''In the case of a strict foreclosure whereby the equity of the mortgagor is entirely wiped out, a comparatively simple problem is presented. Prior to 1899 it seemed to be the general impression that mortgage bondholders could combine with the stockholders of the corporation and readjust the entire property to suit themselves, to the extinction of all intermediary claimants and even to the injury of the mortgage bondholders themselves. Then came the leading case of *Louisville Trust Co. v. Louisville N. A. & C. Ry.*, 174 U. S. 674, the *Monon* case. This decision of the United States Supreme Court held that, with the large amount of the property involved or for other reasons, sales in foreclosure could not be expected to bring real competitive bidding, and that in such cases the foreclosure action was only a step in a reorganization of the corporation, and that the transaction was as if the mortgagor had conveyed directly to the reorganization company in fraud of the rights of lien and of unsecured creditors. . . .

''Until recent years foreclosures of trust mortgages were almost entirely brought in the federal courts, and the state courts were not called upon to enforce the doctrine laid down by the U. S. Supreme Court in *Louisville Trust Co. v. Louisville N. A. & C. Ry., supra.* At the present time, however, there have been a large number of foreclosures of real estate trust mortgages, and the state courts are called upon to apply the principles and practices enunciated in the United States Supreme Court case. *Indeed, it seems to us absurd for*

*the appellants to urge, as they do in this case, that the state courts are incapable of doing the same equity as have the federal courts.''* (Italics ours.)

Text writers on the subject of reorganization of bond issues are generally of the opinion that it is imperative for a committee to act on behalf of the bondholders.

''The position of these bondholders is then precarious (after default) . . . To preserve their interests, they must act together, through representatives, in devising and carrying out a plan of reorganization.'' (Rogers, 42 Harvard Law Review, 899.)

''Any attempt to introduce democracy in this reorganization practice calls for analysis of just what corporate reorganization does. . . . Foreclosed bonds may have to compromise with junior interests to avoid delay or resort to them as the most likely source of any money. What terms shall they offer? These are the commonplace problems of reorganization. Forty thousand scattered bondholders cannot settle them at a town meeting. Vicarious negotiation is inevitable. If this negotiation is to be effective and expeditious, the negotiators must be able to speak with authority. Bondholders' representatives cannot defend in open debate the concessions they are about to make, without convincing the stockholders that better terms should be offered them. The atmosphere of disappointed hope. which hangs over the whole enterprise makes it peculiarly difficult to satisfy everyone. If practically all, or two-thirds, or even a bare majority, have to ratify a plan when made, then the negotiators must so arrange it that they already have the ratifying votes in their pockets when they start to bargain. The alternative is a chaos of interminable talk.'' (Foster, 43 Yale Law Review, 352, 357.)

The formation of committees, recognized by the courts from the very beginning as legal, has continued to receive their sanction and support as the necessity

of the committee has become apparent. For many years, in the case of railroads, public utilities, large industrial enterprises, and during the depression in the case of large real estate properties, the state courts have been faced with the fact that their judicial sales on foreclosures produced no competitive bidding, and that the only prospective purchaser will be, and can be, none other than the security holders acting in concert. This fact was recognized in *Canada Southern R. R. Co. v. Gebhard,* 109 U. S. 527, wherein the court said (p. 539):

"It rarely happens in the United States that foreclosures of railway mortgages are anything else than the machinery by which arrangements between the creditors and other parties in interest are carried into effect, and a reorganization of the affairs of the corporation under a new name brought about."

The same may be said of foreclosures on large hotel and industrial properties having numerous bondholders scattered throughout the country. Courts have been unable and unwilling to deal separately with each of the security holders represented in a foreclosure involving a large and complicated financial structure, and have frequently denied intervention to individual bondholders until a showing was made that the trustee or someone acting on behalf of the bondholders was unfaithfully discharging his duties toward security holders. (*American Trust & Safe Deposit Co. v. 180 East Delaware Bldg. Corp.,* 262 Ill. App. 67, 72, decided by this division of the court.)

It was said in *Parker v. New England Oil Corp.,* 8 F. (2d) 392, that:

"The natural and necessary course of the court has therefore been to promote the organization of these groups and the selection by them of committees, frequently appearing in court by counsel, in order that these representatives may work out and present to the

court a plan of reorganization, agreed upon so far as possible. The court has neither time, capacity, nor disposition to instruct the scattered owners of a receivership estate as to how they may best reorganize their property in order to end the court's control of it. The present practice tends to remit the court to its ordinary and proper function of dealing merely with controversial questions or of settling rights between conflicting interests.''

It thus appears that the method of reorganizing through a bondholders' committee which was approved by the courts as far back as 1880 in *Wetmore v. St. Paul & Pacific R. Co.,* 3 Fed. 177, has generally been recognized by the legal and business worlds as the only feasible method of reorganization.

Except for the case of *Straus v. Anderson,* hereafter considered, we are unable to find any case in this State, decided by a reviewing court, where the precise question of jurisdiction was directly passed upon, but the practice has been sanctioned by clear implication in several instances. In *Chicago Title & Trust Co. v. Robin,* 361 Ill. 261, the chancellor on the hearing of the motion to confirm the report of sale and the Appellate Court both considered the plan submitted by the committee, which through its nominee was the purchaser at the sale and as such was entitled to join in the motion for confirmation thereof. The court said that the bid will be confirmed in the absence of ''fraud, mistake or violation of duty by the officer making the sale or *by the purchaser.''* (Italics ours.) We take this to mean that it becomes the duty of the court to review the plan to determine if the purchaser, who in this instance was the committee, has acted properly.

In *First Nat. Bank of Chicago v. LaSalle-Wacker Bldg. Corp.,* 280 Ill. App. 188, the chancellor had entertained jurisdiction to consider and pass upon a plan for reorganization submitted by a bondholders' com-

mittee after the foreclosure sale. The discussion in that case revolves entirely around certain changes made in the plan of reorganization as a result of the efforts of a group of minority bondholders who had intervened for that purpose. An appeal was taken from that part of the decree allowing attorneys' fees to the objectors for services rendered by them in procuring the modification of the plan. Inherent in the opinion of the Appellate Court is the recognition that the chancellor was justified in considering the fairness of the plan of reorganization as part of the foreclosure proceeding. Although the question of jurisdiction was not raised, obviously if the court had been of the opinion that the chancellor did not have jurisdiction of the subject matter it would not have considered the plan of reorganization and the fees to be allowed to the attorneys for various parties in interest.

In *American Nat. Bank & Trust Co. v. Illinois Improvement & Building Corp.*, 281 Ill. App. 17 (decided by the third division), the Appellate Court impliedly sanctioned the foreclosure proceeding as a prelude to the reorganization contemplated by the bondholders' committee, for in its opinion the court discusses the charges made against the bondholders' committee and the plan by nondepositing bondholders.

Courts have recognized the reorganization of properties through committees for upward of half a century and the practice is abundantly sustained by authority. The only case called to our attention holding otherwise is the recent decision of another division of this court (*Straus v. Anderson*, 283 Ill. App. 342). The bid price and other circumstances in that case impelled the court to reject the sale and reverse the supplemental decree. It was held in effect, however, that courts of equity have no jurisdiction to pass upon plans for reorganization submitted by a committee of bondholders, or to supervise the consummation there-

of; that the plan submitted to the court for its approval is but "a declaratory decree" and not germane to the issues involved, and that it did not settle the rights of the parties in interest. The opinion neither discusses the historically established practice nor the many authorities approving reorganization of properties through committees in foreclosure proceedings. The court cites *Chicago Title & Trust Co. v. Robin, supra,* to support its conclusion. That case turned on three questions, and the court held: (1) that a trustee could not be required to bid in the property on behalf of all bondholders because there was no authority therefor in the trust deed; (2) that the court could not fix an upset price at the foreclosure sale; (3) that mere inadequacy of price, alone, would not justify the court in disaffirming the sale. None of these propositions is pertinent to the jurisdictional question involved. After careful consideration we are compelled to differ with the conclusion there reached, because it is not in harmony with current authority and renders a court of equity powerless to meet the conditions with which it has to deal.

The basic general principles of law involved in the question here under consideration affect many large and valuable properties in foreclosure in the State courts. Within a year the chancellors of the circuit and superior courts have promulgated rules requiring that sales be had in all pending foreclosures within 30, 60 or 90 days after entry of the foreclosure decree, depending upon the security of the issues involved. Since litigants are required to comply with this practice, in the absence of competitive bidding at foreclosure sales, properties will inevitably be purchased for such amounts as the interested parties consider reasonable. Many of these bids will seem inadequate, but under the decision in *Chicago Title & Trust Co. v. Robin, supra,* "mere inadequacy of price, alone," will

not justify the courts in disaffirming sales. If the conclusion reached in *Straus v. Anderson, supra,* were adhered to as a general basic principle, bondholders would of necessity have to be satisfied with their proportionate shares of nominal cash bids, and would in most instances be infinitely worse off than under most fair reorganization plans. They would be deprived of expressing their attitude toward any proposed plan before the court, and driven to the necessity of either participating in plans formulated by committees, not always safeguarded by such modifications as courts might impose, or accepting a small pro rata share of the nominal cash bids made at sales. It is the duty of courts to assist bondholders in such a situation as stated by Mr. Justice Baker in *Investment Registry v. Chicago & M. E. R. Co.,* 212 Fed. 594, 609:

"Most commonly the controversy over the sale arises when there are non-assenting bondholders. When such controversy is on, the chancellor, in our opinion, not only has the right but owes the duty of being vigilant to see, on the one hand, that a dissenter be not permitted to create a maneuvering value in his bonds by opposing confirmation, and, on the other, that the majority does not use its power, unique in sales of this class, to oppress a helpless minority."

Since foreclosures are not statutory proceedings, courts of equity have the power to cope with problems presented and to safeguard the rights of all parties interested and should use every means to insure substantial justice to all parties involved. They have exercised their powers to do so from time immemorial and as Mr. Justice Baker said, "Courts of equity should be deemed no less powerful today than when the first chancellor looked to his conscience for guidance, to make fair dealing between man and man the test." (*Investment Registry v. Chicago & M. E. R. Co.,* 212 Fed. 594, 610.) We find abundant authority holding that they

have the inherent right, duty and power to insure such justice. Federal courts have exercised these equity powers freely and with salutary effect. It would indeed be a serious commentary on the chancery practice of our State courts to hold that they lack the same equity powers as the federal courts.

It is argued that bondholders' committees are self-constituted groups, organized to gain advantages for themselves and those they represent, and through coercion to oppress minority interests. It may be conceded that some of the plans submitted to the courts fail to properly safeguard the interests of both assenting and nonassenting bondholders, but that is only an additional reason to support the doctrine that courts of equity should assume jurisdiction to examine the proposed plans, and, if they are not equitable, to make them so. The mere suggestion that a protective committee may overstep its bounds and serve its own interests, to the detriment of others who are unorganized, emphasizes the necessity for a procedure under which all parties may submit their differences. If it should be held that the court has no jurisdiction to assume that function, examine the plan proposed, modify it if necessary and approve or reject it, the "helpless minority" may obviously be left to the oppression of those who are strongly organized. It is partly for the very protection of this helpless minority that courts have assumed jurisdiction, and they will at the same time be vigilant to see that the dissenter be not "permitted to create a maneuvering value in his bonds by opposing confirmation" of plans which in equity serve the best interests of the whole group.

It is urged by respondents that the price bid at the sale was so low as to constitute fraud *per se*, and that, therefore, the sale should be set aside. The price bid was $1,040,225, and the sale was subject to the second one-half of the 1933 taxes, the 1934 taxes, and part of

the 1935 taxes. On the basis of the 1933 tax assessment, the total unpaid and accrued taxes amounted to approximately $115,000; so that the price paid for the property by the participating bondholders was approximately $1,155,000. There is uncontroverted evidence that at no time during the past 23 years has anyone paid as much as $1,500,000 cash for an apartment hotel building in Chicago. Various experts testified as to the value of the property based upon the different tests that appraisers use in determining property value. Respondents offered no evidence as to the value of the property, and upon the record made by the participating bondholders the contention that the bid price was so inadequate as to constitute fraud *per se* is not convincing. There is no evidence of actual fraud, mistake or irregularity, and the mere inadequacy of price, alone, as was held in *Chicago Title & Trust Co. v. Robin*, 361 Ill. 261, is not cause for setting aside a judicial sale. It was there said that (p. 273):

"Public policy and the interests of debtors require that stability be given to judicial sales, and they should not be disturbed unless there has been some fraud, mistake or violation of duty by the officer making the sale or by the purchaser, none of which is shown here."

As against the plan of reorganization submitted by the bondholders' committee, respondents presented an alternative plan, to be consummated in connection with the proceeding instituted by them on February 28, 1935. Under their plan they proposed to have the trustee bid for all the bondholders, to have a receiver appointed for the mortgagor corporation who was to sell the equity of redemption in the property and the personal effects of the corporation to the trustee. Since the briefs in this case were written it was held by the Supreme Court in *Chicago Title & Trust Co. v. Robin, supra,* that under this form of trust deed a court cannot require the trustee to bid in the property as pro-

posed by the respondents, and therefore the major part of the alternative proposal must be disregarded.

The second major consideration involves the fairness of the committee's reorganization plan. This plan, as modified by the court, provides for the prompt acquisition of merchantable title to the real estate and all furniture and other personal property necessary to the operation of the premises and its transfer to the First National Bank of Chicago, as trustee under a liquidation trust agreement. Under the terms of this trust the entire net income and proceeds of any sale of the property are payable to participating bondholders until they receive the full amount of the bonds originally held by them, plus interest thereon at the rate of five per cent per annum from October 1, 1931, the date of default by the mortgagor corporation.

Under the plan each participating bondholder will receive a 15-year registered income note, in the sum of $50, and a preferred unit of beneficial interest having a nominal value of $50 for each $100 bond originally held by him. The income notes are an obligation of the trust, and therefore a charge upon the property involved. They mature in 15 years, or upon a prior sale of the property or a prior determination of the trust, which may be terminated at any time after the first four years at the request of the majority of the holders of preferred units. The preferred units represent an interest in the income of the property to the extent of their nominal value, subject only to the income notes.

The reorganization plan provides that after the payment in each year of certain income upon the securities to be issued to the participating bondholders, one-half of the balance be placed in a sinking fund for the benefit of such holders. This fund is to be used first to retire income notes, and the trustee is authorized to purchase notes tendered for that purpose. Thus, if sufficient income can be derived from the property, bondholders who do not desire to speculate further with the prop-

erty may accept what they consider a fair amount in cash. In the event that no notes are tendered for sale, the trustee is authorized to redeem the income notes by the payment of the full amount thereof, plus interest at five per cent from October 1, 1931. Should all income notes be retired through the operation of the sinking fund, then such fund will be used to purchase the preferred units tendered to the trustee. The preferred units are not redeemable through the sinking fund, so that the income from the property cannot be used to compel the holders thereof to part with them if they desire to continue their investment.

The plan provides for a corporate trustee, trust managers and the active management and operation of a company to be organized and supervised by William M. Dewey, managing director of the Edgewater Beach Hotel, which adjoins the property here involved. The contract for the active management of the property requires the personal services of Mr. Dewey, subject to supervision, control and direction of the trust managers, and may be terminated at any time if in their judgment or that of the corporate trustee its continuance is not for the best interests of the property. The First National Bank of Chicago is designated as the corporate trustee, and there is a provision in the plan requiring its successor to be a Chicago bank or trust company having a capital and surplus of at least $1,000,000. The corporate trustee or its successor will hold legal title to the property and be responsible for the proper receipt and disbursement of all funds.

The following, as trust managers, are to determine questions of policy and supervise the management of the property: Gilbert H. Scribner, of Winston & Company, an experienced real estate man in Chicago, Raymond H. Schultz, a lawyer, and Abraham K. Selz, Schwab & Company, a well known business man. It appears that the chancellor made an independent investigation into the honesty, integrity and ability of these

men before approving their selection, and invited those present at the hearing to state objections or reasons why they should not serve in that capacity.

The reorganization plan as submitted fixed the compensation to be paid to the management company and to the trust managers during the first year, and provided that all their fees should be restricted to reasonable compensation for the services actually rendered. The chancellor modified the plan by adding a further restriction that the aggregate amount of fees, together with the compensation to be paid the Dewey Management Company or to any other manager employed in its stead, should not in any event, except for good cause shown and pursuant to leave of court, exceed six per cent of the gross income received from rentals of rooms, apartments, stores, etc., plus an amount equal to six per cent of the excess of income over expenses derived from the operation of the commissary, restaurant and garage. Provision is made for the auditing of the books and accounts of the trustee, annually, by independent certified public accountants, whose reports shall be sent to the beneficiaries at least once in each fiscal year, and the court modified the plan by adding the further provision that the trustee should account annually to the court.

The bondholders' committee purchased the equity of redemption from the mortgagor corporation for $10,000, the contract of purchase providing that from the purchase price there be paid and discharged certain franchise taxes due the State of Illinois, which constitute a lien against the personal property of the corporation. Respondents complain of this feature of the plan, and designate it as a reward to the mortgagor and a benefit to its stockholders. However, since the mortgagor corporation is subject to a deficiency judgment for over $5,500,000, its stockholders are not likely to receive and retain any of this money.

It is proposed that Bull, the nominee of the committee, who purchased the property at the sale for $1,040,225, will present the participating bonds as a credit on this bid and pay the balance of his bid price in cash. The cash is to be derived from the participating bondholders' share of the earnings of the property. Thereafter, a redemption from the foreclosure sale is proposed, which will enable the committee to give the trustee under the liquidation trust a clear merchantable title. Since the furniture and other personal property contained in the hotel is not subject to the lien of the mortgage, but only of the deficiency decree, it is proposed that a writ of execution under the deficiency decree be levied against the furniture and personal effects and sold by the sheriff at public auction. A representative of the committee will attend this sale and purchase the property necessary for the operation of the building as reasonably as possible. The proceeds of the sale, after deducting the costs thereof, will be paid to the trustee and distributed pro rata among the bondholders.

In its essential features this plan has apparently been very carefully worked out. The personnel of the board of trust managers, the trustee and managing director offer reasonable assurance that every effort will be made to carry out the plan with a view to preserving the property for those bondholders who participate therein, so that if the rentals and property values are enhanced, they may in the future expect some reasonable return on their investment. Under the supplemental decree the nondepositing bondholders have a reasonable time within which to elect whether they desire to participate in the plan, and those who do not wish to participate and prefer their proportionate share of the cash bid will, with accumulated rentals, receive approximately 22 per cent of the value of their bonds.

Respondents raise various objections to the plan and urge other grounds for reversal of the supplemental order, but we find in them no convincing reasons for reversal. In view of our conclusion that the court had jurisdiction to entertain the intervening petition of the committee, that the plan is equitable and the sale fair, the supplemental decree of the superior court will be affirmed.

*Affirmed.*

SCANLAN, P. J., and JOHN J. SULLIVAN, J., concur.